**In the Matter of Steven F. WILLIAMS, Petitioner/Appellant,**

**v.**

**STATE of Tennessee, DEPARTMENT OF SAFETY, Respondent/Appellee.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

Dec. 2, 1992.

Application for Permission to Appeal Denied by Supreme Court May 10, 1993.

Jerry C. Colley, Colley and Colley, Columbia, for petitioner/appellant.

Charles W. Burson, Atty. Gen. and Reporter, Cecil H. Ross, Asst. Atty. Gen., Nashville, for respondent/appellee.

## OPINION

TODD, Presiding Judge.

The petitioner, Steven F. Williams, has appealed from the judgment of the Trial Court affirming the administrative decision of the Commissioner of Safety directing the forfeiture of the petitioner's 1987 Pontiac Automobile because a controlled substance was found therein on April 21, 1990.

Petitioner's two issues relate to the validity of the search whereby the controlled substance was discovered.

On August 20, 1990, Officer Griffin testified in pertinent part as follows:

Q. If you would, tell the Court how you came to be involved in the seizure of this subject 1987 Pontiac Fiero from Steven Williams.

A. My two partners, Sergeant Chunn and Officer Coleman, and I were patrolling the Columbia area. We do parking lot checks of the beer establishments. The Windjammer is one of them....

What we do is we have found that there's a lot of narcotics use going on in these parking lots. There's a lot of under age drinking and that type of thing. So we do checks of the parking lots. This night we were driving through the Windjammer parking lot.

Q. The Windjammer is a night club?

A. It's a discotheque or a night club. And we saw the black Fiero sitting there with a male and a female in it. As we approached, it appeared that they were in a little argument, domestic type situation. It was not physical domestic, but it just appeared something wasn't right. So I approached the driver's side of the vehicle and tapped on the window. And the car has automatic windows. And in order to roll the window down, you have to have the key on, so he just opened the door to make it easier. So he opened the door, and I identified myself and asked him for his driver's license. As I looked in between his legs I could see a bottle of whiskey laying down. This car is a small car, and it's real tight quarters, and it's hard to get in your wallet or your keys or whatever. So he just got out of the vehicle, reached for his wallet and gave me his license out of his wallet. I then handed the wallet to Sergeant Chunn, who was standing at the rear of the vehicle. And I usually ask—I wrote in my report that I asked him for any guns or drugs. I usually say, are there any bazookas, guns or drugs in the car, to lighten the load a little bit. He said, no. I said, do you mind if I searched? And he said, no, I wouldn't mind.

I went ahead. As Sergeant Chunn was interviewing him, I went ahead and started to search. Like I said, there was an open container of whiskey, a violation of an ordinance in Columbia. It was sitting between his legs, laid down. And I went further and continued searching and came upon the driver's left—it's a pouch, is what it is. You pull on it and it extends out.

Q. Where is that pouch?

A. The left door.

Q. Never (sic?) to the driver's side?

A. Right. But you have to pull away from the door, and it extends in there. It's like a map pouch or whatever you want to call it. Then I found what appeared to be a bag of cocaine, a small bag of cocaine, a quarter of a gram probably. I showed this to Mr. Williams, advised him that he was under arrest. We took him to the jail. We took the cars....

....

Q. Yes. You were not acquainted with the couple?

A. I had never seen the vehicle nor the couple.

Q. Did you stop your vehicle in front or behind the subject vehicle?

A. To the left of the subject vehicle. The car next to it, I guess it was.

....

Q. The windows were rolled up. And that's when Mr. Williams opened the door?

A. Uh-huh (yes).

Q. Instead of rolling the window down?

A. That's correct.

....

Q. Was any alcohol in the bottle, or was it empty?

A. I don't recall.

....

A. Okay. I estimate probably twenty to twenty-five arrests that Maury County Vice has made in that parking lot.

Q. Over what period of time?

A. Since the beginning of the year. Since January.

Q. And are you talking about for—?

A. Drug arrests.

Q. But the only reason you went to this car when you saw the couple arguing or appeared to be arguing, is the fact that on previous occasions there have been automobiles in that parking lot that had controlled substances in them, right?

A. With people in them, right. Yes, sir.

....

Q. So you tapped on the window. And when you tapped on the window, did you tell him to get out of the car, or did you

tap on the window to indicate that you wanted him to get out of the car?

A. No, I tapped on the window. And his reaction was to open the door. I said, could I see your driver's license.

No arrest was made for the possession of the whiskey bottle. The officer testified that he does not ordinarily make arrests on such grounds. Other than the testimony of the officer, there is no evidence in this record that possession of an empty whiskey bottle is an offense for which arrest is proper. The arrest was made after the discovery of the drug, and for the possession of the drug, not the whiskey bottle. There is no evidence that whiskey was in the bottle.

The brief of the Commissioner states:

In this case, the search of the appellant's car would never have taken place if Officer Griffin had not approached it and seen the bottle of liquor inside. Whether or not the search and the subsequent seizure of the vehicle was valid depends on whether this initial approach was constitutionally permissible. If not, then both parties agree that the search of the car was constitutionally infirm, and any evidence found in that search was inadmissible under the Fourth Amendment as the "fruit of the poisonous tree." *See, e.g., Wong Sun v. U.S.,* 371 U.S. 471, 485, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). *See also Hughes v. State,* 588 S.W.2d 296, 307–08 (Tenn. 1979).

The Commissioner cites *State v. Butler,* Tenn.Cr.App.1990, 795 S.W.2d 680. In that case, the defendant was convicted of burglary and complained of the admission into evidence of two pistols and a gold chain taken in the burglary which were found under the following circumstances: On June 18, 1987, the residence of the victim was burglarized and the victims were beaten and bound. On the evening before the burglary, the defendant was seen in the vicinity of the burglary in a white Lincoln Continental with a license number containing the letters "CHZ." Three days later, the defendant and others were in two cars parked near a video rental store at closing time. The opinion then states:

The defendants' car had been sitting in a parking lot posted against loitering from one to two hours. It was late at night and the business had closed. The proprietor had observed the car in the lot and made a complaint to the police. The officer only detained Riggins when she learned that he was not in possession of a valid driver's license. Because a person must have a driver's license in his possession when operating a vehicle, the officer acted within her authority by refusing to let Riggins drive the vehicle away.

From then until the point of arrest, the officers conduct was reasonable. When the officer discovered Butler had a valid operator's license, he was given permission to drive the vehicle off the lot. When the police saw a pistol within Butler's reach, they had a reasonable basis to search the car's passenger compartment. *See Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).

Because the officers had probable cause to arrest both defendants for possession of a weapon with intent to go armed, the search of the passenger compartment may also be upheld as a search incident to arrest. *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981); *State v. Foote,* 631 S.W.2d 470, 472 (Tenn.Crim.App.1982).

Each of the items, in our view, were lawfully seized from Riggins' vehicle.

795 S.W.2d at 685

The circumstances of the present case are not consonant with those of the quoted authority. In the present case, there was no complaint of the owner of the parking lot as to the presence of petitioner and his vehicle. The police were not seeking the perpetrator of a particular crime with information of the description of a vehicle connected with that crime. The officers had no legitimate reason to approach a vehicle legally parked on private property and rap on its window to cause the occupant to open the door, nor to demand his driver's

license. The fact that drugs have previously been discovered in other vehicles in the same parking lot is not probable cause for the actions of these officers.

▆ The Commissioner attempts to justify the actions of the officer as an "investigative stop." This was not a "stop." The vehicle was already stopped and rightfully parked on private property. There was nothing suspicious about one of fifteen or twenty vehicles parked in the parking lot of a night club a few minutes after closing time. Even the apparent argument was not discovered until the officers chose to go about in the private parking lot peering into the parked vehicles. Moreover, what they saw, a non-violent argument, was not a breach of the peace and there was no reason to intervene.

▆ A fair evaluation of the modus operandi of the officers is that they were making a search of the parking lot for occupied vehicles which they hoped to search for drugs by the simple means of knocking on the window, and demanding a driver's license. The motive of finding illegal drugs is meritorious. The method is not. It is unconstitutional.

The Commissioner cites *U.S. v. Stanley*, U.S.C.A. 1st Cir.1990, 915 F.2d 54. However, in that case the single car was parked in an area frequented by drug abusers, not one of fifteen or twenty in a night club parking lot.

Likewise, in *U.S. v. Watson*, U.S.C.A. 5th Cir.1992, 953 F.2d 895, the car was in an abandoned gas station at 3:30 A.M.

In *U.S. v. Turner*, U.S.C.A. 4th Cir.1991, 933 F.2d 240 the suspect emerged from a convenience store carrying a glass of water, went to a car parked away from other cars and "bent over nervously."

In *State v. Freeman*, 64 Ohio St.2d 291, 414 N.E.2d 1044 (1980) cert. den., 454 U.S. 822, 102 S.Ct. 107, 70 L.Ed.2d 94, 1981, the car was parked at 3 A.M. in a motel parking lot which was the scene of recent criminal activity.

In *State v. Januszewski*, 182 Conn. 142, 438 A.2d 679, cert. den., 453 U.S. 922, 101 S.Ct. 3159, 69 L.Ed.2d 1005 (1981), two people were sitting in a car parked in a commuter parking lot at a time when the normal users of the lot would be at work, were observed in "furtive conduct" and one was recognized as a convicted drug offender.

In *State v. Harmon*, Tenn.1989, 775 S.W.2d 583, the car was parked near two closed businesses after midnight.

In *Hughes v. State*, Tenn.1979, 588 S.W.2d 296, the search was invalidated despite the fact that the police were called by a merchant who considered the actions of the occupants of the car to be suspicious. In the present case the police were not called and the occupants were doing nothing suspicious.

▆ The Commissioner relies upon the "high crime area" excuse for intrusion. Every vehicle that enters a "high crime area" is not fair game to inquisitive officers, but only those vehicles and occupants as to which or whom the investigating officers have a reasonable suspicion supported by specific and articulable facts that the law has been or is being violated by the occupants or by use of the vehicle. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Hughes v. State*, Tenn. 1979, 588 S.W.2d 296; *State v. Coleman*, Tenn.Cr.App.1989, 791 S.W.2d 504.

It should also be noted that there is a wide difference between search of an automobile incident to a valid arrest of the occupant and the present case wherein there was no cause for arrest until after the search.

The knock on the window, the opened door, the demand for driver's license, the discovery of the whiskey bottle and the search of the convenience pocket of the car were each and all without a reasonable suspicion of violation of law based upon articulable facts.

▆ The "stop and search" was therefore invalid and the fruits of the search were inadmissible as "fruit of the poisonous tree." *Wong Sun v. U.S.*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). *One 1958 Plymouth Automobile Sedan v.*

*Pennsylvania,* 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965).

With the exclusion of the fruits of the search in testimony and physical evidence, the decision of the Commissioner is unsupported by substantial and material evidence. T.C.A. § 4–5–322(h)(5).

The judgment of the Trial Court is reversed and the decision of the Commissioner is reversed and vacated. Costs of this appeal and Trial Court costs are taxed against the Commissioner. The cause is remanded to the Trial Court for collection of costs in that Court and for further remand to the Commissioner by order consistent with this opinion.

Reversed and Remanded.

LEWIS, J., concurs.

KOCH, J., dissents in separate opinion.

KOCH, Judge, dissenting.

This appeal illustrates one of the consequences of bifurcating intermediate appellate review of civil and criminal cases. On occasion one appellate court is called upon to apply legal principles normally within the other's domain. When this occurs, the court's unfamiliarity with the applicable principles may produce anomalous results as it has in this case.

I.

The Windjammer is a nightclub in Columbia notorious for under-age drinking and drug abuse.[1] While on routine patrol during the early morning hours of April 21, 1990, Maury County vice officers observed a couple sitting in a 1987 black Pontiac Fiero parked in the Windjammer's parking lot. It was after the Windjammer's regular closing time, and the couple appeared to be having a "domestic type" argument.

Faced with a potential breach of the peace and knowing the area's reputation for illegal use of alcohol and drugs, the officers decided to inquire further. They parked their cruiser next to the Fiero, and one of the officers tapped on the driver's window. When the driver, Steven Floyd Williams, opened his door, the officer noticed an opened bottle of whiskey between Mr. Williams's legs.

Mr. Williams got out of his automobile. The officers asked him for his driver's license and asked if he had any guns or drugs in the automobile. When Mr. Williams responded that he did not, the officers asked for permission to search the automobile. Mr. Williams gave permission to search, and the officers found a small bag of cocaine in the map pouch on the driver's door. They also found a small amount of cocaine in the possession of Mr. Williams's female companion.

The officers placed Mr. Williams under arrest. After being advised of his rights, Mr. Williams confessed that he had purchased the cocaine earlier in the evening and that he and his companion had then driven to the Windjammer. The officers charged Mr. Williams with possession of a controlled substance and confiscated his automobile because it had been used to transport a controlled substance.

Mr. Williams sought the return of his Fiero on the ground that "he was not in possession of a controlled substance which would grant the arresting officer the right to seize the vehicle ..." However, he put on no proof at the administrative hearing to contradict the officers' testimony concerning the events in the Windjammer's parking lot. The sole basis for his petition was that the officers "had no information about this car being involved in any kind of illicit drugs" when they commenced their investigative stop.

An administrative law judge ordered the Fiero returned to Mr. Williams on the ground that observing the couple arguing did not give the officers grounds to approach the car.[2] The Commissioner of

---

1. One of the vice officers testified that between twenty and twenty-five arrests for possession of controlled substances had been made at the Windjammer within twelve months prior to the incident involved in this case.

2. The administrative law judge specifically concluded: "Well, we may have come to the point where the police officers can come up and tap on the window when they see you sitting out some place arguing with somebody. We may

Safety reversed the administrative law judge. On appeal, the Chancery Court for Davidson County affirmed the commissioner's decision, finding that aside from the fact that the search was by permission and not in a custodial setting, there were 'specific and articulable' facts to lead a reasonable person to conclude that an investigation was warranted."

## II.

Encounters between the police and the public occur for a great variety of reasons, many of which are wholly unrelated to the investigation or prosecution of crime. *Terry v. Ohio*, 392 U.S. 1, 13, 88 S.Ct. 1868, 1875–76, 20 L.Ed.2d 889 (1968); *State v. Moore*, 776 S.W.2d 933, 937 (Tenn.1989). Accordingly, determinations concerning the propriety of police conduct in a particular case require balancing an individual's right to privacy against the public's interest in effective law enforcement. *Brown v. Texas*, 443 U.S. 47, 50–51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979); *State v. Lakin*, 588 S.W.2d 544, 548 (Tenn.1979).

The standards for reviewing police conduct become more stringent as the degree of invasion of the citizen's privacy increases. *Robertson v. State*, 596 A.2d 1345, 1350 (Del.1991). For the purpose of determining which standard is appropriate, many courts now recognize a three-tier analytical mode first formulated by the United States Court of Appeals for the Fifth Circuit in *United States v. Berry*, 670 F.2d 583, 591 (5th Cir. Unit B 1982).

The first tier of police-citizen encounters includes full scale arrests that must be supported by probable cause. *United States v. Berry*, 670 F.2d at 591; *Ex parte Betterton*, 527 So.2d 747, 750 (Ala.1988); *People v. Murray*, 137 Ill.2d 382, 148 Ill. Dec. 7, 9, 560 N.E.2d 309, 311 (1990). The second tier includes brief investigational stops that must be supported by a reasonable suspicion. *Terry v. Ohio*, 392 U.S. at 21, 88 S.Ct. at 1880; *United States v. Berry*, 670 F.2d at 591; *Hughes v. State*, 588 S.W.2d 296, 305 (Tenn.1979); *State v. Coleman*, 791 S.W.2d 504, 505 (Tenn.Crim.App.

1989). The third tier includes community caretaking or public safety functions that involve no coercion or detention. *United States v. Berry*, 670 F.2d at 591; *Ex parte Betterton*, 527 So.2d at 750; *People v. Murray*, 560 N.E.2d at 312.

With regard to the community caretaking function, it is now generally held that the police may engage a citizen in a public place and may ask questions as long as the citizen is willing to carry on the conversation. *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983); *State v. Butler*, 795 S.W.2d 680, 685 (Tenn. Crim.App.1990). Since these encounters are consental, they do not amount to a seizure and do not require pre-existing probable cause or even reasonable suspicion. *Florida v. Bostick*, —— U.S. ——, ——, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991).

These principles have been applied to police encounters with persons sitting in parked vehicles. 3 Wayne R. LaFave, *Search and Seizure* § 9.2(h), at 415 (2d ed. 1987). Accordingly, most jurisdictions permit the police to approach and question a person sitting in a parked car, *Robertson v. State*, 596 A.2d at 1351; *People v. Murray*, 560 N.E.2d at 313, and even find no fault with a police officer's tapping on a vehicle's window to get the driver's attention. *Ex parte Betterton*, 527 So.2d at 750; *People v. Murray*, 560 N.E.2d at 314.

The propriety of the police conduct depends on the totality of the circumstances existing at the time of the encounter. *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981); *State v. Moore*, 775 S.W.2d 372, 377 (Tenn. Crim.App.1989). Thus, the officers' conduct in this case must be considered in light of the time and place of the encounter and the conduct of all the parties involved.

This encounter began when the officers saw a man and a woman arguing in a parked car. The car was parked in the parking lot of a nightclub notorious as a place where alcoholic beverages and drugs were used illegally. Given the lateness of

have come to that point. I don't know. But I    don't think we have."

the hour, the nature of the location, and the conduct they witnessed, the officers could have reasonably concluded that both occupants of the car might have been intoxicated and that the woman occupant might have been in need of assistance. In addition to observing a potential breach of the peace or even a possible battery, the officers could also have concluded that the driver could be preparing to drive the vehicle while under the influence of an intoxicant.

Under these essentially undisputed facts, the officers did not need a reasonable suspicion and were entirely justified in approaching Mr. Williams's car and in tapping on the window. The record contains no evidence of coercion or force. Mr. Williams's conduct throughout the encounter was entirely consensual, and therefore, the officers' conduct was constitutionally appropriate. The trial court's finding that there were "specific and articulable facts to lead a reasonable person to conclude that an investigation was warranted" must be reviewed using Tenn.Code Ann. § 4-5-322(h) (1991). I would find that the trial court's finding is supported by substantial and material evidence.

### III.

The legal principles concerning encounters between the police and the public should not vary simply because of the identity of the appellate panel applying them. Unfortunately, the majority's decision in this case is inconsistent with the principles announced and applied by the Court of Criminal Appeals. At this stage, only the Tennessee Supreme Court can remedy the matter.

The Supreme Court should not always be called upon to correct errors. Thus, other actions should be considered in order to avoid the continued development of incon-

sistent precedents between the two courts. One option would be to consolidate the two intermediate appellate courts into one court with general appellate jurisdiction. Because of the controversy surrounding this option, a second option would be to amend the forfeiture statutes to provide that appeals in these types of cases will be filed with the Court of Criminal Appeals instead of the Court of Appeals.[3] Until one of these remedial steps is taken, the bench and bar should be wary of the possibility of inconsistency between the intermediate appellate courts on search and seizure issues.

---

**3.** The General Assembly made a similar jurisdictional change in 1976 when it amended Tenn. Code Ann. § 37-1-159(f) (1991) to provide that appeals from a decision to bind a juvenile over for trial as an adult would be to the Court of Criminal Appeals instead of the Court of Appeals. Act of Mar. 29, 1976, ch. 745, § 6(f), 1976 Tenn.Pub.Acts 907, 915. These cases also in-

volve issues normally dealt with by criminal courts. *See State v. Strickland,* 532 S.W.2d 912 (Tenn.1975). Accordingly, the General Assembly concluded that they could be dealt with more effectively in the context of a criminal proceeding rather than through an interlocutory civil appeal.