IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 9, 2002

## STATE OF TENNESSEE v. WILLIAM ROY GRAY

**Direct Appeal from the Circuit Court for Madison County**
**No. 01-513      Donald H. Allen, Judge**

---

**No. W2001-02573-CCA-R3-CD - Filed February 21, 2003**

---

The appellant, William Roy Gray, was convicted in the Circuit Court of Madison County of possession of drug paraphernalia, a Class A misdemeanor, and resisting arrest, a Class B misdemeanor. The trial court sentenced the appellant to eleven months and twenty-nine days in the county jail and imposed a one hundred fifty dollar fine ($150) for the possession of drug paraphernalia conviction and six months in the county jail for the resisting arrest conviction. The trial court ordered the sentences to be served consecutively. On appeal, the appellant contends that the trial court erred in denying the appellant's motion to suppress, in failing to consider certain mitigating factors when sentencing the appellant, and in ordering the appellant to serve his sentences consecutively. After a review of the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Didi Christie, Brownsville, Tennessee (on appeal) and Vanessa D. King, Jackson, Tennessee (at trial), for the appellant, William Roy Gray.

Paul G. Summers, Attorney General and Reporter; P. Robin Dixon, Jr., Assistant Attorney General; James G. (Jerry) Woodall, District Attorney General; and Shaun A. Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION
### I.  Factual Background

At approximately 4:00 a.m. on May 24, 2001, Madison County Sheriff Deputy Charlie Yarbrough was patrolling Denmark-Jackson Road when he observed a vehicle parked facing the street in the driveway of a house he knew to be abandoned. As Deputy Yarbrough pulled into the driveway, he noticed a black male, later identified as the appellant, seated in the vehicle. Deputy Yarbrough observed the appellant bend over as if putting something under the seat of the car.

Deputy Yarbrough exited his patrol car and ordered the appellant to "sit up and raise his hands"; however, the appellant did not respond. Deputy Yarbrough then returned to his patrol car and called for backup. Deputy Stansell was the first to arrive, followed by Deputy Owen and Sergeant Wester.

Upon arrival, Deputy Jerry Stansell proceeded around the back of the house in order to approach the appellant's vehicle from the rear. As Deputy Stansell circled the house, he shined his flashlight into a window and observed that the house was vacant. Deputy Stansell then walked up behind the appellant's vehicle and saw the appellant "sitting behind the steering [wheel] . . . in the driver's seat and just more or less sitting." Deputy Stansell also observed "a small three- to four-inch copper pipe between the [appellant's] legs in the floorboard directly beneath the seat area there that's commonly used to smoke crack." Initially, the officers informed the appellant that he would only be issued a misdemeanor citation if he would relinquish the "crack pipe" to the officers. However, when the appellant refused, the officers advised him that he was under arrest and asked him to step out of the vehicle. The appellant again refused to comply and locked himself inside his vehicle. The appellant then attempted to start his vehicle, so the officers positioned their patrol cars in a manner that prevented the appellant from driving away.

After several unsuccessful attempts to have the appellant exit his vehicle, Sergeant Wester contacted Lieutenant Anthony Heavner and requested his presence at the scene. When Lieutenant Heavner arrived, he attempted to enter the appellant's vehicle using a "slim-jim," but each time Lieutenant Heavner opened the door, the appellant would pull the door closed and lock it. The officers then dispersed the chemical agent "Capstun" through the windows of the appellant's vehicle in an attempt to force the appellant from the vehicle; however, the Capstun had no effect on the appellant. Finally, Lieutenant Heavner broke one of the vehicle's rear vent windows and entered the vehicle through the rear door. The officers had to physically remove the appellant, who clung to the steering wheel and car door.

Prior to breaking the window, Lieutenant Heavner observed what appeared to be a "crack pipe" in the floorboard between the appellant's feet. Lieutenant Heavner photographed the "crack pipe" at that time and again after the appellant was taken into custody. Upon the appellant's removal, the officers searched the vehicle and recovered the "crack pipe" and other objects, including an allen wrench, glass tubing, "steel wool," a lighter, and nails. Lieutenant Heavner testified at trial that these materials are often used to make "crack pipes." No cocaine was found in the vehicle. The appellant was arrested and charged with possession of drug paraphernalia and resisting arrest. The appellant was convicted in the Madison County General Sessions Court of both charges. He was sentenced to eleven months and twenty-nine days in the county jail and assessed a one hundred fifty dollar fine ($150) for the possession of drug paraphernalia conviction and to six months in the county jail and a fifty dollar fine ($50) for the resisting arrest conviction, with the sentences to be served concurrently. The appellant appealed the convictions to the Madison County Circuit Court.

Prior to trial in the Circuit Court, the appellant filed a motion to suppress the evidence obtained from his vehicle, namely the alleged "crack pipe." At the motion to suppress hearing, the

appellant argued that the officers "had no legitimate purpose for approaching [the appellant] on his private property at a car parked at his mother's home." The appellant further asserted that the officers failed to articulate a basis for reasonable suspicion that a crime was being or was about to be committed. Deputy Yarbrough testified at the hearing that he was familiar with the area and knew the house to be abandoned. Deputy Yarbrough related that there had been several burglaries in the neighborhood and that, on "at least four or five" prior occasions, he had discovered individuals unlawfully on the abandoned property. Additionally, Deputy Yarbrough testified that, after observing the appellant "bending over as if [he] were hiding something," he returned to his patrol car to request backup because he "didn't know if [the appellant] had a gun." Deputy Yarbrough conceded that when he asked the appellant to exit the vehicle, the appellant told him that his mother owned the abandoned property and that he lived with his mother in the house next door. However, Deputy Yarbrough testified that he went to the house next door, but no one answered when he knocked on the door.

Deputy Stansell, who responded to Deputy Yarbrough's call for backup, testified at the hearing that he did not know who owned the house and, prior to this incident, he did not know that the house was vacant. Deputy Stansell related that as he approached the appellant's vehicle from the rear on the passenger side, he observed what he believed to be a "crack pipe" laying on the floor in front of the driver's seat. Deputy Stansell conceded that when he first arrived at the house, he did not notice anything illegal about the vehicle parked in the driveway, but he added that, based on the circumstances, it "could have been lawful, or it could have been unlawful."

Upon consideration of the proof, the trial court denied the appellant's motion to suppress. Following a bench trial, the appellant was convicted of possession of drug paraphernalia and resisting arrest. The trial court sentenced the appellant to eleven months and twenty-nine days in the county jail and assessed a one hundred fifty dollar fine ($150) for the possession of drug paraphernalia conviction and to six months in the county jail for the resisting arrest conviction, with the sentences to be served consecutively at seventy-five percent (75%). The appellant timely appealed, arguing that the trial court erred in denying the appellant's motion to suppress, in failing to consider certain mitigating factors when sentencing the appellant, and in ordering the appellant to serve his sentences consecutively. Thereafter, the trial court entered an order allowing the appellant to serve his sentence at home while being monitored by an electronic ankle bracelet.

## II. Analysis

A. Motion to Suppress

The appellant first challenges the trial court's denial of his motion to suppress the evidence obtained from his vehicle. Specifically, the appellant contends that "Deputy Yarbrough had no cause to go onto the private property of the abandoned house to 'investigate' the [appellant's] parked car." Thus, the appellant argues that "the seizure of the alleged crack pipe was illegal and this case should be reversed."

On appeal, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996).

> Questions of credibility of the witnesses, the weight and value of the
> evidence, and resolution of conflicts in the evidence are matters
> entrusted to the trial judge as the trier of fact. The party prevailing in
> the trial court is entitled to the strongest legitimate view of the
> evidence adduced at the suppression hearing as well as all reasonable
> and legitimate inferences that may be drawn from that evidence.

Id. However, the application of the law to the trial court's findings of fact is a question of law subject to de novo review. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997). When reviewing a trial court's ruling on a motion to suppress, the appellate court is not limited to the transcript of the suppression hearing, but may consider the entire record, including the trial transcript. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

Both the Fourth Amendment to the United States Constitution and Article 1, section 7 of the Tennessee Constitution prohibit unreasonable searches and seizures by law enforcement officers. The purpose of the Fourth Amendment and Article 1, section 7 is to "'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" State v. Munn, 56 S.W.3d 486, 494 (Tenn. 2001) (quoting State v. Bridges, 963 S.W.2d 487, 490 (Tenn. 1997)); see also State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997). Consequently, "'a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement.'" State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000) (quoting Yeargan, 958 S.W.2d at 629); Coolidge v. New Hampshire, 403 U.S. 443, 454-55, 91 S. Ct. 2022, 2032 (1971).

The United States Supreme Court announced one such exception to the warrant requirement in Terry v. Ohio, 392 U.S. 1, 21, 88 S. Ct. 1868, 1880 (1968), holding that a law enforcement officer may conduct a brief investigatory stop if the officer has a reasonable suspicion based upon specific and articulable facts that a criminal offense has been, is being, or is about to be committed. See also State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998). In determining whether an officer has a reasonable suspicion based upon specific and articulable facts, a court should consider the totality of the circumstances, including, but not limited to, "the officer's personal objective observations, information obtained from other police officers or agencies, information obtained from citizens, and the pattern of operation of certain offenders. A court must also consider the rational inferences and deductions that a trained officer may draw from the facts and circumstances known to him." Yeargan, 958 S.W.2d at 632; United States v. Cortez, 449 U.S. 411, 417-18, 101 S. Ct. 690, 695 (1981). The officer "'must be able to articulate something more than an inchoate and unparticularized suspicion or hunch.'" Keith, 978 S.W.2d at 867 (quoting United States v. Sokolow, 490 U.S. 1, 7-8, 109 S. Ct. 1581, 1585 (1989)).

In support of his argument, the appellant cites to In re Williams, 854 S.W.2d 102, 106 (Tenn. Ct. App. 1992), in which the Court of Appeals held the "stop and search" of one of many vehicles parked in the private parking lot of a nightclub was "invalid . . . and the fruits of the search were inadmissible as 'fruit of the poisonous tree.'" In Williams, officers were patrolling the private

parking lot of a nightclub known as a place for drug use and underage drinking when they observed Williams and a female companion quarreling in a black Fiero. Id. at 103-04. The officers tapped on the window and asked to see Williams's driver's license. Id. at 104. When Williams opened his door, the officer observed a whiskey bottle between his legs. Id. The officer then asked to search the vehicle and Williams consented to the search. Id. In addition to the bottle of whiskey, the officer discovered a small bag containing cocaine in a pouch on the driver's side door. Id. The Commissioner of Safety ordered the forfeiture of the vehicle and, after the chancery court affirmed the administrative decision, Williams appealed to the Court of Appeals. Id. at 103. The Court of Appeals concluded that the search was invalid and reversed the forfeiture, holding that

> there was no complaint of the owner of the parking lot as to the presence of [Williams] and his vehicle. The police were not seeking the perpetrator of a particular crime with information of the description of a vehicle connected with that crime. The officers had no legitimate reason to approach a vehicle legally parked on private property and rap on its window to cause the occupant to open the door, nor to demand his driver's license. The fact that drugs have previously been discovered in other vehicles in the same parking lot is not probable cause for the action of these officers. vehicles parked in the parking lot of a night club a few minutes after closing time.

Id. at 105-06.

We find Williams to be readily distinguishable from the instant case. Although there was no complaint by the owner of the property, Deputy Yarbrough was on regular patrol of a rural area when he passed a house he knew to be abandoned. Unlike the parking lot of a nightclub shortly after closing, it was unusual for Deputy Yarbrough to see a vehicle parked in the driveway of an abandoned house at 4:00 a.m. Moreover, Deputy Yarbrough observed an individual sitting in the vehicle. Certainly, based upon these circumstances, it was rational for Deputy Yarbrough to suspect a crime was being committed and investigate.

Considering the totality of the circumstances, we conclude, as did the trial court, that the evidence demonstrates that Deputy Yarbrough had a reasonable suspicion supported by specific and articulable facts that the appellant was committing, or about to commit, a criminal offense. Deputy Yarbrough testified both at the suppression hearing and at trial that he knew the house was abandoned. He related that, when he drove past the house at approximately 4:00 a.m. and observed a vehicle parked in the driveway, he decided to investigate because there had been several burglaries in the area and on prior occasions he had discovered other individuals unlawfully "parked" at the house. Moreover, Deputy Yarbrough testified that as he pulled into the driveway, he observed the appellant sitting in the vehicle, bending over as if hiding something under the seat. These circumstances provided a sufficient basis for reasonable suspicion to believe that a crime had been or was about to be committed. This issue is without merit.

B. Sentencing

The appellant next asserts that the trial court erred in sentencing the appellant. Specifically, the appellant argues that the trial court failed to take into consideration certain mitigating factors and erroneously imposed consecutive sentences. The State responds that the trial court properly sentenced the appellant. We agree with the State.

When an appellant challenges the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d) (1997). Generally, the presumption of correctness is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). However, the trial court has more flexibility in misdemeanor sentencing than in felony sentencing. State v. Johnson, 15 S.W.3d 515, 518 (Tenn. Crim. App. 1999) (citing State v. Troutman, 979 S.W.2d 271, 273 (Tenn. 1998)). Review of misdemeanor sentencing is de novo with a presumption of correctness even if the trial court failed to make specific findings on the record, because the "trial court need only consider the principles of sentencing and enhancement and mitigating factors in order to comply with the legislative mandates of the misdemeanor sentencing statute." Troutman, 979 S.W.2d at 274. The burden is on the appellant to show that the sentence is improper. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

The misdemeanor sentencing guidelines are codified in Tennessee Code Annotated section 40-35-302 (Supp. 2002), which provides in pertinent part that the trial court shall impose a specific sentence consistent with the purposes and principles of the 1989 Criminal Sentencing Reform Act. See also State v. Palmer, 902 S.W.2d 391, 392 (Tenn. 1995). Unlike a defendant convicted of a felony, a defendant convicted of a misdemeanor is not entitled to a presumptive minimum sentence. Johnson, 15 S.W.3d at 518 (citing State v. Baker, 966 S.W.2d 429, 434 (Tenn. Crim. App. 1997)). Rather, in sentencing the misdemeanor defendant, the trial court shall fix a percentage of the sentence, not to exceed seventy-five percent, that the defendant must serve in confinement before being eligible for release into rehabilitative programs. Tenn. Code Ann. § 40-35-302(d). The trial court shall consider the sentencing principles and enhancement and mitigating factors in determining the percentage to be served and "shall not impose such percentages arbitrarily." Tenn. Code Ann. § 40-35-302(d); see also Troutman, 979 S.W.2d at 274. "Thus, a misdemeanor defendant may be sentenced to the maximum term for the appropriate class, but by statute, must be deemed eligible for consideration for . . . rehabilitative programs after service of no more than seventy-five percent of that sentence." Palmer, 902 S.W.2d at 392 (footnote omitted).

In the instant case, the appellant was convicted of possession of drug paraphernalia, a Class A misdemeanor, and resisting arrest, a Class B misdemeanor. Tenn. Code Ann. §§ 39-17-425(a)(2) (1997), 39-16-602(d) (Supp. 2002). The authorized sentence for a Class A misdemeanor is a period not greater than eleven months and twenty-nine days. Tenn. Code Ann. § 40-35-111(e)(1) (1997). The authorized sentence for a Class B misdemeanor is a period not greater than six months. Id. at (e)(2). Moreover, the trial court is authorized to fix the percentage to be served in confinement, not to exceed seventy-five percent (75%). Tenn. Code Ann. § 40-35-302(d).

In sentencing the appellant, the trial court considered the presentence report, evidencing the appellant's criminal history; a letter from the coordinator of the Pathways Out-Patient Alcohol and Drug Treatment Program; and the appellant's medical records. Additionally, the trial court questioned the appellant regarding his medical condition. The appellant testified that he had been both HIV positive and infected with Hepatitis A since 1991. He related that he had a doctor's appointment every two weeks and was taking five different types of medications. The appellant stated that he had not worked since he was released from prison in 1994. The appellant conceded that he had not previously sought drug treatment, but he stated, "I just know I need help." Following the arguments of counsel, the trial court sentenced the appellant, ordering the appellant to serve his sentences in the county jail or workhouse. However, after the filing of this appeal, the trial court entered an order allowing the appellant to serve his sentence at home while being monitored by an electronic ankle bracelet due to "the hardship on both the Madison County Sheriff's Department and [the appellant]."

On appeal, the appellant asserts that the trial court erred in failing to consider as mitigating factors the appellant's terminal medical condition, the appellant's enrollment in long-term drug treatment, and the fact that the appellant's conduct neither posed a threat to the public, nor caused or threatened serious bodily injury. Tenn. Code Ann. § 40-35-113(1) and (13) (1997). Our review of the record reveals that the court did consider the appellant's medical condition and enrollment in drug treatment. At sentencing, counsel for the appellant requested that the appellant be allowed to serve his sentence on probation, either unsupervised or monitored by an ankle bracelet. The trial court responded,

> [t]he Court is going to take into consideration the possibility of perhaps using the ankle bracelet that [trial counsel] has referred to. I'm not going to order that today. I don't feel like it's appropriate at this time. But obviously, [the appellant] does have a medication situation that is going to cause some problems if he has to serve this eighteen months in the local jail or workhouse. . . . But at this time, I feel like [the appellant] has to serve the jail time, so I am going to order that he serve this time.
> . . . .
> [I]f I let him go onto some kind of house arrest with the ankle bracelet, then I would order that -- or I will consider the application or the request for some type of drug treatment.

Thus, the trial court did consider the appellant's medical condition and drug treatment, but felt that the more appropriate sentence at that time would be to require the appellant to serve his sentence in confinement. The trial court, as it was free to do, agreed to consider at a later date "some kind of house arrest with the ankle bracelet." Tenn. Code Ann. § 40-35-302(e). As previously noted, after the filing of this appeal, the trial court entered an order allowing the appellant to serve his sentence at home while being monitored by an ankle bracelet.

The record does not indicate whether the trial court considered as mitigating factors that the appellant's conduct neither posed a threat to the public nor caused or threatened serious

bodily injury. Tenn. Code Ann. § 40-35-113(1) and (13). However, in misdemeanor sentencing, "[t]he lack of findings is no basis for holding the trial court in error." State v. Russell, 10 S.W.3d 270, 278 (Tenn. Crim. App 1999). The presumption of correctness applies despite the trial court's failure to make specific findings on the record. Troutman, 979 S.W.2d at 274. This court reviews misdemeanor sentencing to ensure that the trial court considered the enhancement and mitigating factors and did not act arbitrarily. State v. Ricky Ray Humphrey, No. E2001-00512-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 703, at *4 (Knoxville, Aug. 20, 2002). We conclude that the trial court did not act arbitrarily and that the sentences imposed by the trial court are supported by the sentencing principles and the applicable enhancement and mitigating factors. At the sentencing hearing, the trial court found that the appellant had an extensive criminal history dating back to 1980, which history consisted of eight prior felony convictions, including drug and robbery convictions, and four prior misdemeanor convictions. Tenn. Code Ann. § 40-35-114(1) (1997).[1] Based on that history, the trial court stated that "incarceration is really the only option that we have at this point because of this long, extensive history."

Finally, the appellant contends that the trial court erred in imposing consecutive sentences. Under Tennessee Code Annotated section 40-35-115(b) (1997), the trial court may order a defendant's sentences to run consecutively if the trial court finds by a preponderance of the evidence that:

> (1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;
> (2) The defendant is an offender whose record of criminal activity is extensive;
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

---

[1] The 2002 amendment to this section added present enhancement factor (1), thereby renumbering former (1)-(22). See Tenn. Code Ann. § 40-35-114, Amendments. However, for the purposes of this opinion, we will use the former designations applicable at the time of sentencing.

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

The appellant argues that "the trial court made no specific finding that any of these factors applied in its sentencing of [the appellant]." Our review of the record reveals otherwise. At the sentencing hearing, the trial court stated, "The Court is going to run these sentences consecutively because of [the appellant's] extensive prior criminal history." Clearly, the trial court imposed consecutive sentences under subsection (b)(2), i.e., the appellant is an offender whose record of criminal activity is extensive. This issue is without merit.

### III. Conclusions

Finding no reversible error, we affirm the judgments of the trial court.

_____

NORMA McGEE OGLE, JUDGE