# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2012AP1812 |
| COMPLETE TITLE: | County of Grant,<br>      Plaintiff-Respondent-Petitioner,<br>   v.<br>Daniel A. Vogt,<br>      Defendant-Appellant. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
346 Wis. 2d 551,830 N.W.2d 723
(Ct. App. 2013 - Unpublished)

| | |
|---|---|
| OPINION FILED: | July 18, 2014 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | January 9, 2014 |

| SOURCE OF APPEAL: | |
|---|---|
| COURT: | Circuit |
| COUNTY: | Grant |
| JUDGE: | Robert VanDeHey |

| JUSTICES: | |
|---|---|
| CONCURRED: | ZIEGLER, ROGGENSACK, GABLEMAN, JJJ., concur. (Opinion filed.) |
| DISSENTED: | ABRAHAMSON, C.J., BRADLEY, J., dissent. (Opinion filed.) |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the plaintiff-respondent-petitioner, there was a brief by *Anthony J. Pozorski Sr.*, assistant district attorney, and Grant County, and oral argument by *Anthony J. Pozorski Sr.*

For the defendant-appellant, there was a brief by *Jeffery J. Scott*, and *Block, Scott & Heenan, LLC*, Platteville, and oral argument by *Jeffery J. Scott.*

**2014 WI 76**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2012AP1812
(L.C. No. 2012TR459 & 2012TR460)

STATE OF WISCONSIN        :        IN SUPREME COURT

County of Grant,

      Plaintiff-Respondent-Petitioner,

  v.

Daniel A. Vogt,

      Defendant-Appellant.

**FILED**

**JUL 18, 2014**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Reversed.*

¶1 DAVID T. PROSSER, J. This is a review of an unpublished decision of the court of appeals,[1] reversing a decision of the Grant County Circuit Court, which found the defendant guilty of operating a vehicle while intoxicated.

¶2 The case affords this court an opportunity to develop the law on "seizure" under the Fourth Amendment. The issue presented is whether, under the totality of the circumstances, a law enforcement officer "seized" the defendant, Daniel Vogt

---

[1] Cnty. of Grant v. Vogt, No. 2012AP1812, unpublished slip op. (Wis. Ct. App. Mar. 14, 2013).

(Vogt), when he knocked on the driver's window of Vogt's vehicle and asked Vogt to roll down the window.  When Vogt complied, the officer immediately smelled alcohol in the vehicle and noticed Vogt's slurred speech, leading to an investigation and Vogt's ultimate arrest.   In these circumstances, did the officer "seize" Vogt before the officer had probable cause or reasonable suspicion to believe that Vogt committed an offense?

¶3   Although we acknowledge that this is a close case, we conclude that a law enforcement officer's knock on a car window does not by itself constitute a show of authority sufficient to give rise to the belief in a reasonable person that the person is not free to leave.  The objective of law enforcement is to protect and serve the community.  Accordingly, an officer's interactions with people are not automatically adversarial.  A court's "seizure" inquiry into one of these interactions must examine the totality of the circumstances, seeking to identify the line between an officer's reasonable attempt to have a consensual conversation and a more consequential attempt to detain an individual.  The facts in this case do not show a level of intimidation or exercise of authority sufficient to implicate the Fourth Amendment until after Vogt rolled down his window and exposed the grounds for a seizure.  Consequently, we reverse.

I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

¶4   In the early morning of December 25, 2011, Deputy Matthew Small (Deputy Small) of the Grant County Sheriff's Department was on patrol duty in the Village of Cassville.  The

2

village is located on the Mississippi River, southwest of Lancaster, the Grant County seat. In 2010 Cassville had a population of 947. Around 1 a.m., Deputy Small observed a vehicle on Prime Street turn west and pull into the parking lot next to a closed park and boat landing on the Mississippi. He did not observe any traffic violations but thought the driver's conduct was suspicious.

¶5 Riverside Park closed at 11 p.m., but the adjacent parking lot remained open. Deputy Small said, however, that because of the time of year (Christmas), and because the park was closed and there were no boats at the landing, he thought it was odd for someone to be there.[2]

¶6 His curiosity piqued, Deputy Small pulled into the parking lot and parked his marked squad car behind Vogt's vehicle a little off to the driver's side. The squad car's headlights were on, but its red and blue emergency lights were not. Vogt's car was running and had its lights on as well. Deputy Small said at the suppression hearing that he was not

---

[2] The circuit court opined that it was reasonable for Deputy Small to ask Vogt what he was doing. During the hearing on Vogt's motion to suppress, the court commented, "I mean on one hand, what the officer did seems perfectly reasonable. You know, 2:00 in the morning, nobody's going to be launching a boat on Christmas Day." At trial, the court reiterated the reasonableness of Deputy Small's conduct when it noted that "there is really not anything unreasonable with approaching a vehicle at bar time and finding out why they're parked at . . . a boat landing that apparently was not closed, but the park next to it was closed."

blocking the car and that the driver could have left, although Daniel Vogt later disagreed.

¶7    Deputy Small got out of his squad car and walked up to Vogt's window. He was in full uniform and had a pistol in his side holster. There were two people in the vehicle: Vogt in the driver's seat and Kimberly Russell (Russell) in the passenger's seat. Deputy Small testified at the trial that he rapped on the window but could not recall if the knock was hard or soft.[3] He also said that he motioned for Vogt to roll down the window and that if Vogt had ignored him and driven away, Deputy Small would have let him go because he "had nothing to stop him for."

¶8    When Vogt rolled down the window, Deputy Small asked him what he was doing, and Vogt said that he was trying to figure out his radio. Deputy Small said that Vogt's speech was slurred and that he could smell intoxicants coming from inside the vehicle. Deputy Small asked Vogt for his driver's license and went back to his squad car. He turned on the red and blue emergency lights and moved the squad car back and a little to the left so that he could videotape the interaction. Deputy Small asked Vogt to step out of the vehicle for a field sobriety test, during which Vogt showed signs of intoxication. Deputy Small then placed Vogt under arrest and transported him to the Grant County Jail in Lancaster where Vogt submitted to an evidentiary chemical test of his breath. The test indicated

---

[3] Previously, at a suppression hearing, Deputy Small said he could not remember whether the window was up or down but said that he "may have knocked on the window."

4

that Vogt had a prohibited alcohol concentration (PAC) of .19——more than twice the legal limit.  <u>See</u> Wis. Stat. § 340.01(46m)(a) (2011-12).[4]

¶9  Vogt was cited for operating a motor vehicle while under the influence of an intoxicant (OWI) and PAC contrary to Wis. Stat. § 346.63(1)(a).[5]  Because this was his first violation of § 346.63(1)(a), it was a civil violation.  <u>See</u> Wis. Stat. § 346.65(2)(am).  Vogt filed a plea of not guilty on January 5, 2012.  On February 29, 2012, he moved to suppress all evidence obtained during his allegedly unlawful detention and arrest on grounds that Deputy Small did not have reasonable suspicion to conduct a traffic stop.  The Grant County Circuit Court, Robert P. VanDeHey, Judge, held a motion hearing on March 30, 2012, during which Deputy Small was the only witness to testify.

¶10  The circuit court denied the motion to suppress in a written order on April 23, 2012.  Judge VanDeHey relied on the seizure analysis articulated in <u>United States v. Mendenhall</u>, 446 U.S. 544, 554 (1980), and determined that Deputy Small's conduct did not constitute a seizure.  The circuit court noted:

> Deputy Small did not draw his gun.  His emergency lights were not in operation.  There is no showing that he raised his voice.  There is some evidence that he impeded the operation of the defendant's automobile

---

[4] All subsequent references to the Wisconsin Statutes are to the 2011-12 version unless otherwise indicated.

[5] Although the PAC citation lists only Wis. Stat. § 346.63(1)(a) as the violated statute, the statute that specifically prohibits driving with a prohibited alcohol concentration is Wis. Stat. § 346.63(1)(b).

in that he initially parked somewhat to the side and behind the vehicle and then had to re-position his vehicle to conduct field sobriety tests. There is no evidence that Deputy Small "commanded" Mr. Vogt to roll down his window by tapping on the window and motioning that he roll down his window.

Although the circuit court believed it was a close case, the court denied the motion to suppress.

¶11 A trial to the court took place on July 5, 2012. Vogt's passenger, Russell, testified that Deputy Small's rap on the window was "hard" and that he said, "Give me your driver's license." According to Russell, Deputy Small's voice "was forceful," and he did not say "please" or "thank you." Russell also described the parking lot. To the right of the vehicle were a lit pop machine and the park. As Deputy Small said, the squad car was behind Vogt's vehicle, a little closer to the driver's side. The Mississippi River was in front of Vogt's vehicle. Wisconsin Power & Light Company was on the left,[6] and Deputy Small was standing on the left side of Vogt's vehicle. Russell thought that Vogt could not have ignored Deputy Small and could not have left because there was nowhere for him to go.

¶12 Vogt testified that Deputy Small "rapped on the window very loud" with his knuckles and told Vogt to open the window without saying "please" or "would you." Vogt said that Deputy Small's voice was commanding and that he did not think he had any alternative to rolling down the window. Vogt said that he

---

[6] Vogt admitted on cross-examination that Wisconsin Power & Light Company was far enough away that it would not have prevented him from turning left.

could not have pulled forward and turned around, could not have turned left without hitting Deputy Small, could not have turned right without hitting the pop machine, and could not have backed up because of the squad car. On cross-examination, Vogt admitted that the boat landing was roughly 40 yards wide and that the Mississippi River could have been 50 feet in front of him. In the past, ice had washed up onto the parking lot, but Vogt did not know how far it had washed up on December 25, 2011, if at all. Vogt agreed that he had had too much to drink and should not have been driving.

¶13 At the end of the trial, Vogt renewed his motion to suppress. In making its decision, the circuit court noted that there was a question as to whether Deputy Small verbally commanded Vogt to roll down the window. The court said:

> There is additional evidence today that was not brought forth at the motion hearing, particularly that the officer rapped loudly on the window and supposedly commanded Mr. Vogt to roll down the window. That's different than the officer's testimony who indicated that he just wanted to see what was going on. He was suspicious. Had Mr. Vogt decided to drive away, he would have let him.
>
> The officer also testified that he did not block the vehicle in, that the vehicle could have gotten around him. So there are a few factual distinctions as far as the testimony. It's not a very bright line, and I don't know how a driver knows the difference between a command and a suggestion, particularly when we're talking about a physical movement, the knocking on the window.
>
> To the extent that Mr. Vogt and Ms. Russell's testimony differs from the officer's, the resolution probably is somewhere in between, that the officer wasn't as aggressive as the occupants of the vehicle

thought, and maybe he wasn't quite as subtle as he thought he was being. But the basic facts are that there was [a] vehicle running at night at bar time. The officer knocked on the window, rapped on the window. There is a dispute as to whether there was actually a verbal command after that. I don't know that that's the case. Given that the vehicle was running and the time of night and the officer's initial testimony that he probably just knocked on the window, that that seems to be the——well, at least the consistent testimony.

Vogt's attorney interrupted to remind the court that at the motion hearing, Deputy Small could not remember how he approached Vogt. The court responded:

Yeah, and it was quoted in the decision, but I——his testimony today was that it——if Mr. Vogt drove away, he wasn't going to stop him. He had no reason to do it, which would indicate that he wasn't commanding him to do anything, is that he was simply trying to make contact.

¶14 The circuit court found Vogt guilty of the OWI violation and dismissed the PAC count. The court ordered a forfeiture of $899, revoked Vogt's license for seven months, ordered alcohol assessment and a driver safety plan, and entered an order for a mandatory ignition interlock for one year. All penalties were stayed pending appeal. The judgment of conviction was filed on August 3, 2012, and Vogt filed a notice of appeal on August 13, 2012.

¶15 In an unpublished decision, the court of appeals reversed the circuit court. Cnty. of Grant v. Vogt, No. 2012AP1812, unpublished slip op. (Wis. Ct. App. Mar. 14, 2013). The court of appeals determined that "when a uniformed officer approaches a vehicle at night and directs the driver to roll

8

down his or her window, a reasonable driver would not feel free to ignore the officer." Id., ¶13.  The court of appeals assumed that Deputy Small "directed Vogt to roll down his window, rather than asking him if he would do so."  Id.  Based on this assumption, the court of appeals concluded that a reasonable driver would not have felt free to leave, and therefore, Deputy Small seized Vogt without reasonable suspicion.  Id., ¶¶13-14.

¶16  The County of Grant petitioned this court for review, which we granted on October 15, 2013.

## II. STANDARD OF REVIEW

¶17  Whether someone has been seized presents a two-part standard of review.  State v. Williams, 2002 WI 94, ¶17, 255 Wis. 2d 1, 646 N.W.2d 834.  This court will uphold the circuit court's findings of fact unless they are clearly erroneous, but the application of constitutional principles to those facts presents a question of law subject to de novo review.  Id.  The same standard of review applies to a motion to suppress.  See State v. Hess, 2010 WI 82, ¶19, 327 Wis. 2d 524, 785 N.W.2d 568.

## III. DISCUSSION

¶18  Under the Fourth Amendment of the United States Constitution, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."  U.S. Const. amend. IV.[7]  The Wisconsin Constitution contains the same

---

[7] The Fourth Amendment to the United States Constitution reads in full:

language,[8] and "[w]e have historically interpreted the Wisconsin Constitution's protections in this area identically to the protections under the Fourth Amendment as defined by the United States Supreme Court."[9]  State v. Dearborn, 2010 WI 84, ¶14, 327 Wis. 2d 252,  786  N.W.2d 97  (footnote  omitted)  (citation omitted).

¶19  The law on searches and the law on seizures present separate lines of analysis.  With respect to the latter, the

---

The right of the people to be secure in their persons,  houses,  papers,  and  effects,  against unreasonable  searches  and  seizures,  shall  not  be violated,  and  no  Warrants  shall  issue,  but  upon probable  cause,  supported  by  Oath  or  affirmation,  and particularly  describing  the  place  to  be  searched,  and the  persons  or  things  to  be  seized.

U.S. Const. amend. IV.

[8] The Wisconsin Constitution reads:

The right of the people to be secure in their persons,  houses,  papers,  and  effects  against unreasonable  searches  and  seizures  shall  not  be violated;  and  no  warrant  shall  issue  but  upon  probable cause,  supported  by  oath  or  affirmation,  and particularly  describing  the  place  to  be  searched  and the  persons  or  things  to  be  seized.

Wis. Const. art. I, § 11.

[9] While  this  court  generally  interprets  the  Wisconsin Constitution  to  give  the  same  protections  as  the  Fourth Amendment  of  the  United  States  Constitution,  we  have  determined that  the  Wisconsin  Constitution  offers  more  protection  than  the Fourth  Amendment  under  the  good  faith  exception,  which  does  not apply  in  this  case.  See State v. Eason, 2001 WI 98, ¶60, 245 Wis. 2d 206, 629 N.W.2d 625.  Because  we  interpret  the  Wisconsin Constitution  to  be  coterminous  with  the  United  States Constitution  in  this  area,  the  analysis  in  this  opinion  applies to  both  constitutions.

Fourth Amendment and Article I, Section 11 of the Wisconsin Constitution are not implicated until a government agent "seizes" a person.  State v. Young, 2006 WI 98, ¶23, 294 Wis. 2d 1, 717 N.W.2d 729.  The reason is that not all personal interactions between law enforcement officers and people constitute a seizure.  Mendenhall, 446 U.S. at 552; Young, 294 Wis. 2d 1, ¶18 ("[N]ot all police-citizen contacts constitute a seizure . . . .").

¶20  A seizure occurs "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen."  Mendenhall, 446 U.S. at 552 (quoting Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968)).  As Justice Stewart stated in Mendenhall, "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  Id. at 554 (footnote omitted).

¶21  When Mendenhall was written, Justice Stewart's lead opinion was joined by only Justice Rehnquist.  Justice Powell authored a concurrence, joined by Chief Justice Burger and Justice Blackmun, in which he observed that "I do not necessarily disagree with" Justice Stewart's standard, but "the question whether the respondent . . . reasonably could have thought she was free to 'walk away' when asked by two Government agents for her driver's license and ticket is extremely close."  Id. at 560 n.1 (Powell, J., concurring).

11

¶22 The Court's tentative acceptance of Justice Stewart's standard has since been bolstered and confirmed. INS v. Delgado, 466 U.S. 210, 215-17 (1984); Florida v. Royer, 460 U.S. 491, 497, 502-04 (1983) (plurality opinion); see also Kaupp v. Texas, 538 U.S. 626, 629-30 (2003); Florida v. Bostick, 501 U.S. 429, 434-35 (1991); California v. Hodari D., 499 U.S. 621, 627-28 (1991); Michigan v. Chesternut, 486 U.S. 567, 573 (1988); Delgado, 466 U.S. at 228 (Brennan, J., concurring in part, dissenting in part) (citations omitted) ("A majority of the Court has since adopted [the Mendenhall] formula as the appropriate standard for determining when inquiries made by the police cross the boundary separating merely consensual encounters from forcible stops to investigate a suspected crime.").

¶23 After articulating the test for determining when a seizure takes place, Justice Stewart went on to list some examples of circumstances that might suggest a seizure: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Mendenhall, 446 U.S. at 554 (citations omitted); see Kaupp, 538 U.S. at 630. Justice Stewart stated that without similar evidence that would lead a reasonable person to believe that he or she was not free to leave, an interaction with law enforcement is not a seizure as a matter of law. Mendenhall, 446 U.S. at 555 (stating that "inoffensive contact between a

12

member of the public and the police cannot, as a matter of law, amount to a seizure of that person").

¶24 The Supreme Court provided further guidance in Delgado, when it stated that "police questioning, by itself, is unlikely to result in a Fourth Amendment violation. While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." Delgado, 466 U.S. at 216 (citing Schneckloth v. Bustamonte, 412 U.S. 218, 231-34 (1973)). The Court then adopted the Mendenhall standard and stated that there is no seizure "[u]nless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave." Id.

¶25 The rule that a seizure occurs only when law enforcement restrains a person's liberty by show of authority advances the goals of the Fourth Amendment:

> The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but "to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." United States v. Martinez-Fuerte, 428 U.S. 543, 554 [(1976)]. As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.

Mendenhall, 446 U.S. at 553-54. To facilitate these goals, the test is objective and "calls for consistent application from one police encounter to the next, regardless of the particular

13

individual's response to the actions of the police." Chesternut, 486 U.S. at 574.

¶26 To sum up, there are countless interactions or encounters among police and members of the community. Not all encounters are seizures, and these non-seizure encounters are not governed by the Fourth Amendment. Other interactions or encounters are seizures and are subject to Fourth Amendment criteria. Fourth Amendment jurisprudence focuses on the line between seizures and mere encounters as well as the reasonableness of the police/citizen interactions that do constitute seizures.

¶27 There are two kinds of permissible seizures. Young, 294 Wis. 2d 1, ¶20. A Terry stop is an investigatory stop for which a law enforcement officer must have reasonable suspicion "in light of his experience that criminal activity may be afoot."[10] Terry, 392 U.S. at 30; see Young, 294 Wis. 2d 1, ¶20; State v. Waldner, 206 Wis. 2d 51, 57, 556 N.W.2d 681 (1996). An

---

[10] The standards for a Terry stop are codified in the Wisconsin Statutes:

> After having identified himself or herself as a law enforcement officer, a law enforcement officer may stop a person in a public place for a reasonable period of time when the officer reasonably suspects that such person is committing, is about to commit or has committed a crime, and may demand the name and address of the person and an explanation of the person's conduct. Such detention and temporary questioning shall be conducted in the vicinity where the person was stopped.

Wis. Stat. § 968.24.

14

officer has reasonable suspicion when he "possesses specific and articulable facts which would warrant a reasonable belief that criminal activity was afoot." Waldner, 206 Wis. 2d at 55 (citing State v. Chambers, 55 Wis. 2d 289, 294, 198 N.W.2d 377 (1972)).

¶28 The second kind of permissible seizure is an arrest, which normally involves "a trip to the station house and prosecution for crime." Young, 294 Wis. 2d 1, ¶22 (quoting Terry, 392 U.S. at 16). To make an arrest, a law enforcement officer must have probable cause to believe that the person arrested has committed a crime. Id. That is, the officer must "have sufficient knowledge at the time of the arrest to 'lead a reasonable police officer to believe that the defendant probably committed or was committing a crime.'" Id. (quoting State v. Secrist, 224 Wis. 2d 201, 212, 589 N.W.2d 387 (1999)).

¶29 In the present case, neither type of permissible seizure came into play until Vogt opened the window and Deputy Small detected signs of intoxication. Deputy Small may have had a savvy hunch that the driver of the Vogt vehicle had been drinking. But a savvy hunch is not equivalent to the reasonable suspicion that would have justified a Terry-type temporary detention. Because Deputy Small did not have reasonable suspicion to believe Vogt was operating while intoxicated until after Vogt opened his window, we must determine whether Vogt was seized before his window was rolled down.

A. Wisconsin Seizure Law

15

¶30 This court has adopted the Mendenhall test for determining whether a seizure took place, and it is the proper test for this case.  Id., ¶37 ("Mendenhall is the appropriate test for situations where the question is whether a person submitted to a police show of authority because, under all the circumstances surrounding the incident, a reasonable person would not have felt free to leave.").  The test is objective and considers whether an innocent reasonable person, rather than the specific defendant, would feel free to leave under the circumstances.  See Williams, 255 Wis. 2d 1, ¶23.

¶31 The seizure test is necessarily objective,[11] but it is complicated by the tendency of people to defer to a symbol of authority no matter how it is manifested.  A badge might imbue an officer's request with intimidation in the mind of some persons, but the law must be more discerning.  In most cases it is important for courts conducting a Fourth Amendment seizure analysis to distinguish between a person's individual predisposition, which might lead the person to consent to an

---

[11] The test must be objective because "any test intended to determine what street encounters are not seizures must be expressed in terms that can be understood and applied by the officer.  Asking him to determine whether the suspect feels free to leave, however 'would require a prescience neither the police nor anyone else possesses.'"  4 Wayne R. LaFave, Search and Seizure § 9.4(a), at 568 (5th ed. 2012) (quoting United States v. Hall, 421 F.2d 540 (2d Cir. 1969)).

officer's inquiry, and an officer's objective conduct.[12]    To their credit, citizens and others may feel tethered by social norms to an officer's request and may consent in order to avoid the taboo of disrespecting an officer of the law.    However, a person's consent is no less valid simply because an individual is particularly susceptible to social or ethical pressures.[13] Were it otherwise, officers would be hesitant to approach anyone for fear that the individual would feel "seized" and that any question asked, however innocuous, would lead to a violation of the Fourth Amendment.    Thus, when determining whether an individual was seized, we must replace the individual with the

---

[12] See INS v. Delgado, 466 U.S. 210, 228 (1984) (Brennan, J., concurring in part, dissenting in part) (stating that the seizure analysis "properly looks not to the subjective impressions of the person questioned but rather to the objective characteristics of the encounter which may suggest whether or not a reasonable person would believe that he remained free during the course of the questioning to disregard the questions and walk away") (citing 3 W. LaFave, Search and Seizure § 9.2, at 52 (1978)).

[13] 4 Wayne R. LaFave, Search and Seizure § 9.4(a), at 581 (5th ed. 2012) (footnote omitted) (suggesting that law enforcement "should be allowed 'to seek cooperation, even where this may involve inconvenience or embarrassment for the citizen, and even though many citizens will defer to this authority of the police because they believe——in some vague way——that they should.'") (quoting Model Code of Pre-Arraignment Procedure 258 (1975)).

17

paradigmatic reasonable person and focus on the officer's conduct under the totality of the circumstances.[14]

¶32 Although we have established the proper standards for seizure cases, this court has not yet considered whether a person is necessarily seized within the meaning of the Fourth Amendment when a law enforcement officer knocks on the window of the person's vehicle. However, we have expressed reluctance to determine that pulling up behind a car and "present[ing] indicia of police authority" automatically constitutes a seizure. Young, 294 Wis. 2d 1, ¶¶65, 69 ("[N]ot every display of police authority rises to a 'show of authority' that constitutes a seizure."). In Young, the officer stopped his squad car in the middle of the street behind the defendant's car, which was parked on the side of the street. Id., ¶10. The officer shined his spotlight on the defendant's vehicle and turned on his emergency flashers, but he did not activate his red and blue emergency lights. Id. This court was reluctant to label the officer's conduct a "seizure," in part because he did not stop

---

[14] To some extent, the "reasonable person" here is a legal fiction. That defendants often consent to searches of areas that reveal incriminating evidence demonstrates that people often do not feel free to decline an officer's request, even absent a manifest show of authority. However, the reasonable person standard is necessary if the inquiry is to remain objective. The value of objective standards in this area cannot be gainsaid because the alternative is to equate the innocuous to the arbitrary and substantially limit the role of law enforcement in the community.

the defendant's car (it was parked already),[15] and the officer did not use his red and blue emergency lights.  Id., ¶¶66, 68-69.  We did not have to decide in Young whether the officer's conduct was a seizure, but the case demonstrates that not all manifestations of authority will result in a seizure.

### B. Decisions from Other Jurisdictions

¶33 Several jurisdictions outside Wisconsin have determined that knocking on a vehicle's window does not necessarily constitute a seizure.[16]  We discuss some of these factually similar cases below.

---

[15] In contrast, we determined that an impermissible seizure occurred when officers stopped a moving vehicle without reasonable suspicion by blocking its path with an unmarked squad car.  State v. Harris, 206 Wis. 2d 243, 247, 258-59, 263, 557 N.W.2d 245 (1996).

[16] See, e.g., United States v. Barry, 394 F.3d 1070 (8th Cir. 2005) (no seizure when officer got out of his squad car, shined a flashlight on his uniform and kept a hand on his gun as he approached the defendant and knocked on the defendant's vehicle window three separate times until defendant opened the window); Ex parte Betterton, 527 So. 2d 747, 748-50 (Ala. 1988) (determining that it was not a seizure when an officer approached a parked car and knocked on the driver's window); State v. Cerrillo, 93 P.3d 960 (Wash. Ct. App. 2004) (officer knocking on vehicle window to wake up sleeping occupants and requesting driver's license was not a seizure); Custer v. State, 135 P.3d 620, 625-26 (Wyo. 2006) (no seizure when officer knocked on vehicle window twice to get defendant's attention).  But see State v. Patterson, 868 A.2d 188, 192-93 (Me. 2005) (concluding that officer's knock on a car window and an order to roll down the window constituted a seizure, although a mere request might have led to a different result); Williams v. State Dep't of Safety, 854 S.W.2d 102 (Tenn. Ct. App. 1992) (determining that an officer's knock on a car window violated the Fourth Amendment because there was no reasonable suspicion).

¶34 In State v. Randle, 276 P.3d 732 (Idaho Ct. App. 2012), an officer saw the defendant's "vehicle alone in a parking lot with its front-end abutting a grassy knoll." Id. at 733. The officer parked about two car lengths behind the defendant, left the headlights of his squad car on, and knocked on the defendant's window. Id. The defendant opened the door, and the officer noticed two open beer cans in the cup holder. Id. The officer smelled alcohol on the defendant's breath and decided to conduct a field sobriety test, which the defendant failed. Id. at 734. In considering the defendant's motion to suppress the evidence of intoxication, the circuit court determined that even though he could not pull forward, the defendant could have backed up and driven away and was not seized. Id. at 737. The court of appeals agreed, stating:

> After this review of the totality of the circumstances surrounding the encounter between Randle and the officer, we conclude that, when the officer parked behind Randle's vehicle, left the patrol car's headlights on, approached Randle's vehicle and knocked on the window, such conduct would not have communicated to a reasonable person that he or she was not at liberty to ignore the officer's presence and go about his or her business.

Both cited cases that have determined that the circumstances surrounding an officer's knock on a vehicle window constituted a seizure are readily distinguishable. In Patterson, the court determined that the officer commanded the driver to roll down the window instead of merely making a request. Patterson, 868 A.2d at 192-93. The court in Williams did not conduct a seizure analysis and instead ended the inquiry when it determined that the officers did not have a reasonable suspicion to knock on the vehicle window. Williams, 854 S.W.2d at 105-07. Therefore, neither case provides persuasive guidance for this court.

Id. at 738.

¶35 In State v. Steffes, 791 N.W.2d 633 (N.D. 2010), an officer responded to a tip that a man who appeared intoxicated was entering a vehicle in the parking lot of a bar. Id. at 634. The officer arrived and parked far enough from Steffes' vehicle so that Steffes could leave the parking spot if he wanted. Id. Steffes was sitting in the driver's seat holding a cell phone, and the radio was playing loudly. Id. at 635. The officer "tapped on the driver's side window and with his finger motioned downward indicating he wanted Steffes to lower the window." Id. Steffes looked at the officer but did not respond, so the officer knocked again. Id. At that point, Steffes opened the door slightly and began to talk with the officer. Id.

¶36 While the two were talking, another officer arrived. Id. When the first officer asked Steffes for his driver's license, Steffes said that he did not have it with him and gave a fake name and birthdate. Id. Steffes was charged with providing false information to a law enforcement officer and moved to suppress on grounds that he was unlawfully seized. Id. The district court denied the motion and entered judgment on Steffes' conditional guilty plea. Id. On appeal, Steffes argued that the officer's second knock, oral request, and hand gesture constituted a seizure. Id. at 636. The Supreme Court of North Dakota noted that the officer did not turn on the red and blue emergency lights, did not block Steffes' car, and did not display authority. Id. Therefore, Steffes was not seized. Id. at 637.

21

¶37 In State v. Bryant, 161 S.W.3d 758 (Tex. App. 2005), around 2:00 a.m., an officer noticed the defendant's car turn into a shopping center in which the businesses were closed. Id. at 760, 762. The officer pulled into the parking lot, got out of his patrol car, and knocked on the defendant's window. Id. When the defendant opened his car door, the officer smelled alcohol and arrested the defendant for driving while intoxicated. Id. The circuit court suppressed the evidence of intoxication because the defendant did not violate any traffic laws, and the officer did not have reasonable suspicion to approach the defendant's car and knock on the window. Id. at 761. The court of appeals reversed, determining that the officer "was not required to have reasonable suspicion that [the defendant] was engaged in criminal activity to approach [the defendant's] car and knock on his window." Id. at 762. Thus, the interaction "did not become an investigative detention until after [the defendant] opened his car door." Id.

¶38 These cases demonstrate that when an officer parks near a person's vehicle, gets out, and knocks on the person's window, the officer has not necessarily displayed sufficient authority to cause a reasonable person to feel that he or she

22

was not free to leave.[17]   While a person is not automatically seized by a knock on the window, or even a supplementary request, the seizure inquiry looks at the totality of the circumstances to determine whether the officer has effected a detention.   Thus, we turn to the facts of the case before us to determine whether Vogt was unlawfully seized.

C. The Interaction Between Vogt and Deputy Small

¶39 Vogt's argument focuses mainly on Deputy Small's conduct before Vogt opened the window.   Once the window was open and Deputy Small smelled intoxicants and detected Vogt's slurred speech, Deputy Small had reasonable suspicion that Vogt was operating his vehicle while intoxicated.   Before that point, the parties agree that Deputy Small did not have reasonable suspicion to stop Vogt.   Thus, the question for this court is whether Deputy Small seized Vogt at any time before Vogt rolled down his window.   We conclude that he did not.

¶40 Vogt suggests that the seizure occurred when Deputy Small knocked on the window and "commanded" Vogt to roll down the window.   Vogt admits that Deputy Small did not seize him by

---

[17] See 4 Wayne R. LaFave, Search and Seizure § 9.4(a), at 574-77 (5th ed. 2012) (footnotes omitted) ("[I]f an officer merely walks up to a person standing or sitting in a public place (or, indeed, who is seated in a vehicle located in a public place) and puts a question to him, this alone does not constitute a seizure.").   In addition, "The officer may tap on the window and perhaps even open the door if the occupant is asleep.   A request that the suspect open the door or roll down the window would seem equally permissible, but the same would not be true of an order that he do so." Id., § 9.4(a), at 594-95 (footnotes omitted).

23

following him into the parking lot. He admits that Deputy Small did not seize him by getting out of his squad car and would not have seized him by walking around Vogt's car and looking through the windows. However, Vogt takes issue with the location of Deputy Small's car and his conduct at Vogt's window. In claiming that a seizure took place, Vogt highlights several alleged facts: (1) Deputy Small parked right behind Vogt's vehicle; (2) "the location of Mr. Vogt's vehicle in the parking lot was not conducive to simply driving away"; (3) Deputy Small commanded Vogt to roll down the window; and (4) Deputy Small rapped loudly on the window.

¶41 Even taken together, these facts do not demonstrate that Vogt was seized. Although Deputy Small parked directly behind Vogt and allegedly there were obstacles on three sides of Vogt's vehicle, these facts do not demonstrate that Vogt was seized because he still could have driven away. The circuit court did not explicitly find that Vogt had room to leave the parking lot, but "if a circuit court fails to make a finding that exists in the record, an appellate court can assume that the circuit court determined the fact in a manner that supports the circuit court's ultimate decision." State v. Martwick, 2000 WI 5, ¶31, 231 Wis. 2d 801, 604 N.W.2d 552 (citing Sohns v. Jensen, 11 Wis. 2d 449, 453, 105 N.W.2d 818 (1960)). The appellate court is entrusted to make that assumption "only when evidence exists in the record to support the 'assumed fact.'" Id., ¶74 (Abrahamson, C.J., dissenting). The record supports the assumption that Vogt had room to leave.

24

¶42  Although Deputy Small pulled up behind Vogt's vehicle, there was testimony at trial that Vogt might have had 50 feet in front of him in which he could have pulled forward and turned around.    In addition, the video from the camera in Deputy Small's squad car shows ample room for the car to move forward. There was some discussion about ice washing up onto the lot in the past; however, there is no ice visible on the video and no evidence that there actually was ice on December 25, 2011. Thus, we assume that because the circuit court determined that a reasonable person in Vogt's circumstances would have felt free to leave, there was an avenue by which Vogt could have actually left.    Like the defendant in Randle who was not seized simply because the grassy knoll limited his exit options, Randle, 276 P.3d at 733, 738, Vogt was not seized simply because there was only one way out of the parking lot.

¶43  Vogt's assertion that he was seized because of Deputy Small's "command" to roll down the window also is unpersuasive. The circuit court found in its decision on the motion to suppress that "[t]here is no evidence that Deputy Small 'commanded' Mr. Vogt to roll down his window by tapping on the window and motioning that he roll down his window."    At trial, the court found that Deputy Small's testimony "would indicate that he wasn't commanding [Vogt] to do anything, . . . that he was simply trying to make contact."    Even though the circuit court noted that Deputy Small maybe "wasn't quite as subtle as he thought he was being," the court still determined that Deputy Small's conduct was not so intimidating as to constitute a

25

seizure.   Thus, Vogt's arguments that he was seized due to a "command" from Deputy Small are unavailing.[18]

¶44 Vogt also emphasizes the loudness of the knock in arguing that he was seized.   Although the seizure analysis considers the totality of the circumstances, the volume of the knock generally will not play a significant roll in the analysis.   We live in a time of distraction where earbuds connected to smartphones or other music devices are commonplace. Vehicles may be outfitted with sophisticated stereo systems.   It might be necessary for an officer to motion or to knock in order to attract the attention of a person with whom he would like to speak if the person is willing.   To prescribe the types of permissible attention-getting gestures or the allowable volume of a knock would be an unrealistic venture.   A knock might sound loud to an unsuspecting vehicle occupant, but that alone does not mean the occupant has been seized.

¶45 Vogt also implies that the fact that he was in a vehicle affects the analysis because if he had left, he might have been charged with obstruction.   Vogt's argument implicitly

---

[18] The court of appeals decided to assume that Deputy Small "commanded" Vogt to roll down the window. Cnty. of Grant v. Vogt, No. 2012AP1812, unpublished slip op., ¶13 (Wis. Ct. App. Mar. 14, 2013).   After noting that there was a discrepancy between Deputy Small's and Vogt's testimony, the court of appeals said that "those distinctions are not determinative in this case because without clarification, we must assume that the officer directed Vogt to roll down his window, rather than asking him if he would do so." Id.   Because the circuit court made findings that Deputy Small did not command Vogt and determined Vogt was not seized, the court of appeals' assumption was not correct.

26

suggests that Wis. Stat. § 346.04,[19] which prohibits a driver from ignoring a signal from a traffic officer, limited Vogt's ability to drive away. At oral argument, the County of Grant pointed out that Wis. Stat. § 346.04 is inapplicable because it applies only to highways. We agree.

¶46 Wisconsin Stat. § 346.02(1) is clear: "This chapter applies exclusively upon highways except as otherwise expressly provided in this chapter." The term, "highways," does not include public parking lots. 65 Wis. Op. Att'y Gen. 45 (1976) (OAG 45-47). A 1957 legislative committee note to Wis. Stat.

---

[19] Wisconsin Stat. § 346.04 provides:

(1) No person shall fail or refuse to comply with any lawful order, signal or direction of a traffic officer.

(2) No operator of a vehicle shall disobey the instructions of any official traffic sign or signal unless otherwise directed by a traffic officer.

(2t) No operator of a vehicle, after having received a visible or audible signal to stop his or her vehicle from a traffic officer or marked police vehicle, shall knowingly resist the traffic officer by failing to stop his or her vehicle as promptly as safety reasonably permits.

(3) No operator of a vehicle, after having received a visual or audible signal from a traffic officer, or marked police vehicle, shall knowingly flee or attempt to elude any traffic officer by willful or wanton disregard of such signal so as to interfere with or endanger the operation of the police vehicle, or the traffic officer or other vehicles or pedestrians, nor shall the operator increase the speed of the operator's vehicle or extinguish the lights of the vehicle in an attempt to elude or flee.

27

§ 346.61 is "highly persuasive evidence of legislative intent that public parking lots are not highways for the purpose of enforcement of ch. 346, Stats., generally." Id. at 46.

¶47 The exceptions alluded to in the phrase "except as otherwise expressly provided in this chapter" are the exceptions found in Wis. Stat. § 346.61, namely, §§ 346.62 to 346.64 (reckless driving and drunken driving). These exceptions apply beyond the limitation of "highways" and thus may be applied in public parking lots. However, these exceptions do not include Wis. Stat. § 346.04, which applies "exclusively upon highways." Thus, Vogt could have driven out of the parking lot without violating § 346.04.

¶48 If Deputy Small had pursued Vogt and ordered him to stop once he left the parking lot, Vogt could have pulled over to comply. But stopping a moving vehicle is indisputably a seizure, State v. Harris, 206 Wis. 2d 243, 557 N.W.2d 245 (1996), and requires Fourth Amendment analysis.

¶49 In any event, Vogt cannot speculate about what might have happened if he had tried to leave. See Delgado, 466 U.S. at 220-21 (stating that defendants "may only litigate what happened to them"). In short, § 346.04 does not support Vogt's argument. We need not decide whether § 346.04 would affect the seizure analysis if Deputy Small had encountered Vogt on a highway. However, § 346.04 does not apply to the facts as we know them.

¶50 To support his arguments, Vogt cites an unpublished court of appeals decision involving an interaction between a

person in a vehicle and two police officers. See City of Kenosha v. Tower, No. 2009AP1957, unpublished slip op. (Wis. Ct. App. Oct. 6, 2010). In Tower, two bike patrol officers approached the defendant's van, which was stopped with the engine running on the side of the street where there was a "no parking" sign. Id., ¶2. Immediately after making contact with the defendant, the officers ordered her to "put the vehicle in 'park.'" Id. The officers noticed signs of intoxication, and eventually, because the defendant refused to provide a breath sample, her license was revoked. Id., ¶¶2-4. On appeal, the city appeared to acknowledge that a seizure occurred and focused on whether there was reasonable suspicion. Id., ¶¶7, 11 ("Because the City argues this was a valid Terry stop, on appeal we need only address whether the facts known to the officers, considered together as a totality of the circumstances, provided them the requisite reasonable suspicion to justify stopping Tower."). Thus, Tower does not support Vogt's argument because the question in that case was whether there was reasonable suspicion, not whether the defendant was seized.

¶51 Ultimately, what Deputy Small did in this case is what any traffic officer might have done: investigate an unusual situation. As the circuit court noted, "what the officer did seems perfectly reasonable." Deputy Small was acting as a conscientious officer. He saw what he thought was suspicious behavior and decided to take a closer look. Even though Vogt's conduct may not have been sufficiently suspect to raise reasonable suspicion that a crime was afoot, it was reasonable

29

for Deputy Small to try to learn more about the situation by engaging Vogt in a consensual conversation.[20]

¶52 The Fourth Amendment's prerequisites for a seizure are intended to safeguard the privacy of all persons; thus, a mere hunch is not enough to condone a seizure. See Terry, 392 U.S. at 27. Yet, while the law applicable to the facts of this case does not condone a seizure, it does not forestall an officer's reasonable attempt at further inquiry. In similar circumstances, a person has the choice to refuse an officer's attempt to converse and thereby retain his privacy, or respond by talking to the officer and aiding the officer in his duty to protect the public. A dutiful officer does not make a mistake by presenting a person with that choice. Only when the officer forecloses the choice by the way in which he exercises his authority——absent reasonable suspicion or probable cause——does he violate the Fourth Amendment.

¶53 Although it may have been Vogt's social instinct to open his window in response to Deputy Small's knock, a reasonable person in Vogt's situation would have felt free to leave. As several jurisdictions have recognized, a law enforcement officer's knock on a vehicle window does not automatically constitute a seizure. The circumstances attendant to the knock in the present case are not so intimidating as to

---

[20] See Barry, 394 F.3d at 1075 (citation omitted) (stating that the officer "probably would have been remiss had he ignored the vehicle parked in an alley behind closed stores at 11:18 p.m.").

30

transform the knock into a seizure.   None of the examples outlined by Justice Stewart as demonstrating a seizure are present in this case.  See Mendenhall, 446 U.S. at 554-55.  Vogt was not subject to the threatening presence of multiple officers.  Deputy Small did not brandish any weapon.  There is no evidence that Deputy Small touched Vogt, and as discussed above, Deputy Small did not speak in a way that would suggest Vogt was compelled to roll down the window.  While the facts of Justice Stewart's examples need not be present for there to be a seizure, the facts in this case are not sufficient to demonstrate that a reasonable person would not feel free to leave.  Therefore, under the totality of the circumstances, Vogt was not seized.

### IV. CONCLUSION

¶54  Although we acknowledge that this is a close case, we conclude that a law enforcement officer's knock on a car window does not by itself constitute a show of authority sufficient to give rise to the belief in a reasonable person that the person is not free to leave.  The objective of law enforcement is to protect and serve the community.  Accordingly, an officer's interactions with people are not automatically adversarial.  A court's "seizure" inquiry into one of these interactions must examine the totality of the circumstances, seeking to identify the line between an officer's reasonable attempt to have a consensual conversation and a more consequential attempt to detain an individual.  The facts in this case do not show a level of intimidation or exercise of authority sufficient to

31

implicate the Fourth Amendment until after Vogt rolled down his window and exposed the grounds for a seizure.  Consequently, we reverse.

*By the Court.*—The decision of the court of appeals is reversed.

¶55 ANNETTE KINGSLAND ZIEGLER, J. *(concurring).* I join the majority opinion, but concur and go further to conclude that even if a seizure were to have occurred, the officer was acting as a community caretaker at the time of the seizure.

¶56 "Officers may exercise two types of functions: law enforcement functions and community caretaker functions." State v. Pinkard, 2010 WI 81, ¶18, 327 Wis. 2d 346, 785 N.W.2d 592 (citing Cady v. Dombrowski, 413 U.S. 433, 441 (1973)). Officers acting in their community caretaker capacity "may be constitutionally permitted to perform warrantless searches and seizures." Id., ¶14 (citing Cady, 413 U.S. at 448; State v. Ziedonis, 2005 WI App 249, ¶14, 287 Wis. 2d 831, 707 N.W.2d 565). The exception exists, in part, because "'[a]n officer less willing to discharge community caretaking functions implicates seriously undesirable consequences for society at large.'" Id., ¶33 (quoting State v. Horngren, 2000 WI App 177, ¶18, 238 Wis. 2d 347, 617 N.W.2d 508).

¶57 An officer is engaged in a "bona fide community caretaker function" only if that officer has "an objectively reasonable basis" to conclude "that a motorist may have been in need of assistance" at the time of the stop. State v. Kramer, 2009 WI 14, ¶¶36-37, 315 Wis. 2d 414, 759 N.W.2d 598. Further, the exception to the warrant requirement is satisfied only if "the officer's exercise of a bona fide community caretaker function was reasonable." Id., ¶40 (citing State v. Kelsey C.R., 2001 WI 54, ¶35, 243 Wis. 2d 422, 626 N.W.2d 777). This

1

requires courts to "balanc[e] a public interest or need that is furthered by the officer's conduct against the degree of and nature of the restriction upon the liberty interest of the citizen." Id. In balancing these interests, courts consider the following factors:

> (1) the degree of the public interest and the exigency of the situation; (2) the attendant circumstances surrounding the seizure, including time, location, the degree of overt authority and force displayed; (3) whether an automobile is involved; and (4) the availability, feasibility and effectiveness of alternatives to the type of intrusion actually accomplished.

Id., ¶41.

¶58 With respect to the first factor, "the public has a substantial interest in ensuring that police assist motorists who may be stranded . . . ." Kramer, 315 Wis. 2d 414, ¶42. Police assistance to motorists is "'not only authorized, but constitute[s] an important duty of law enforcement officers.'" Id. (quoting State v. Goebel, 103 Wis. 2d 203, 208, 307 N.W.2d 915 (1981)). Thus, the first factor weighs in favor of the reasonableness of Officer Small's exercise of the community caretaker function.

¶59 With respect to the second factor, Officer Small was checking on the occupants of a vehicle parked at the top of a boat ramp in a closed park at approximately 1:00 on Christmas

2

morning.[1]  The presence of the vehicle in a closed park, at that hour, and at that time of the year, was unusual at a minimum. Under the totality of the circumstances, it was objectively reasonable for Officer Small to conclude that the occupants of the vehicle might be in need of assistance.[2]  Further, as the majority opinion properly notes, Officer Small used a minimum of overt authority and force in contacting the driver of the vehicle.  Majority op., ¶¶40-44.  The second factor thus weighs in favor of the reasonableness of Officer Small's conduct.

¶60 The third factor also militates in favor of finding that Officer Small acted reasonably, as the case at issue involves an automobile.  See Kramer, 315 Wis. 2d 414, ¶44.  As this court has stated, "a citizen has a lesser expectation of privacy in an automobile," and so the privacy interest at issue weighs less heavily against the officer.  Ziedonis, 287 Wis. 2d 831, ¶31.

¶61 Finally, in considering the fourth factor, Officer Small had no other reasonable alternatives for discharging his

---

[1] As a practical matter, Vogt's presence in the parking lot after the park had closed was quite possibly illegal.  Vogt concedes that the park was closed, and that a posted sign indicated that it was illegal to enter the park after closing. Grant County Ordinances § 200-2 gives a broad definition of "park" that would seem to encompass the parking lot.

[2] While Officer Small testified that he thought the vehicle was "suspicious," we have held that when "'an objectively reasonable basis for the community caretaker function is shown, that determination is not negated by the officer's subjective law enforcement concerns.'"  State v. Pinkard, 2010 WI 81, ¶31 n.11, 327 Wis. 2d 346, 785 N.W.2d 592 (quoting State v. Kramer, 2009 WI 14, ¶30, 315 Wis. 2d 414, 759 N.W.2d 598).

community caretaker function. See Kramer, 315 Wis. 2d 414, ¶45. Officer Small had to contact the driver of the vehicle in order to determine whether he was in need of assistance. As discussed, the manner of that contact was reasonable. The fourth factor thus weighs in Officer Small's favor as well. Thus, I conclude that Officer Small's conduct in the case at issue was a reasonable exercise of his community caretaker function.

¶62 Indeed, not only was Officer Small's checking on the occupants of the vehicle objectively reasonable, we also expect our officers to react to such situations in this way and not sit idly by with the hope that the occupants will be safe.

¶63 The facts in the case at issue are essentially identical to those in Kramer. Officer Small did not act in an overbearing or excessively intrusive manner. His behavior was constitutionally permissible. Officer Small simply walked up to the driver's side window of the vehicle to initiate contact with the driver. Under the circumstances presented, his action was "the only reasonable approach that [the officer] could take in performing this community caretaker function." Kramer, 315 Wis. 2d 414, ¶44. As a result, I conclude that Officer Small's conduct was justified under the community caretaker exception.

¶64 For the foregoing reasons, I concur.

¶65 I am authorized to state that Justices PATIENCE DRAKE ROGGENSACK and MICHAEL J. GABLEMAN join this concurrence.

¶66 SHIRLEY S. ABRAHAMSON, C.J. *(dissenting).* I would affirm the decision of the court of appeals holding that the officer's conduct in the instant case constituted a seizure of the defendant within the meaning of the federal and state constitutions.

¶67 No one disputes that the legal standard to be applied to determine whether a seizure occurred in the instant case is as follows: "[A] seizure occurs if 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'"[1]

¶68 The dispute is about the application of the legal standard to the totality of the circumstances of the instant case.[2]

---

[1] Brendlin v. California, 551 U.S. 249, 255 (2007) (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)).

See also majority op., ¶30; State v. Williams, 2002 WI 94, ¶23, 255 Wis. 2d 1, 646 N.W.2d 834.

[2] The totality of the circumstances is important. A small variation in the circumstances often determines the outcome. See Wayne R. LaFave, 4 Search & Seizure: A Treatise on the Fourth Amendment § 9.4(a), at 594-95 (5th ed. 2013):

> [T]he mere approach and questioning of [persons seated in parked vehicles] does not constitute a seizure. The result is not otherwise when the officer utilizes some generally accepted means of gaining the attention of the vehicle occupant or encouraging him to eliminate any barrier to conversation. The officer may tap on the window and perhaps even open the door if the occupant is asleep. A request that the suspect open the door or roll down the window would seem equally permissible, but the same would not be true of

¶69 Here are the circumstances: It was late at night; the parking lot was empty; Deputy Small was in full uniform with his pistol fully visible; the deputy parked his squad car with headlights on right behind the defendant's vehicle; the location of the defendant's vehicle in the parking lot was not conducive to simply driving away; Deputy Small rapped loudly on the window; Deputy Small signaled the defendant to roll down the window.

¶70 Courts across the country have divided when confronted with facts substantially similar to the ones in the instant case.[3] Why? Because courts engage in a fiction in determining whether the mythical reasonable person in the position of the defendant would have believed that he or she was not free to leave.[4]

¶71 Studies demonstrate that the reasonable person "free to leave" standard applied in judicial decisions does not generally reflect what real, everyday people think and how they

---

an order that he do so (footnotes omitted, emphasis added).

[3] See several cases described in majority op., ¶¶33-38.

[4] See majority op., ¶31 n.14.

act when approached by law enforcement officers.[5]  In short, the world of legal decisions does not reflect the real world.  As Professor LaFave has written, the United States Supreme Court finds "a perceived freedom [to leave] in circumstances when only the most thick-skinned of suspects would think such a choice was open to them."[6]

¶72  When I look to the totality of the circumstances in the instant case, I conclude that, under the circumstances, a reasonable person would not have felt free to leave.  A reasonable person would have had three options:  (1) to drive away; (2) to stay put with the window closed; or (3) to comply with the officer's directions.

¶73  No reasonable person I can imagine would feel free to drive away under the circumstances of the present case when the

---

[5] See, e.g., David K. Kessler, Free To Leave: An Empirical Look at the Fourth Amendment's Seizure Standard, 99 J. Crim. L. & Criminology 51 (2009) (concluding that the average person does not feel free to leave simple interactions with police officers, based on empirical evidence from studying two scenarios in which the United States Supreme Court has held that a reasonable person would feel free to leave, on public sidewalks and on busses); Edwin J. Butterfoss, Bright Line Seizures: The Need for Clarity in Determining When Fourth Amendment Activity Begins, 79 J. Crim. L. & Criminology 437, 439-42 (1988) (describing the "free to leave" test as artificial, resulting in outcomes "which bear little relationship to the individual's actual freedom to walk away"); Janice Nadler, No Need to Shout: Bus Sweeps and the Psychology of Coercion, 2002 Sup. Ct. Rev. 153 (2002) (criticizing broadly the Court's post-Mendenhall jurisprudence as ignorant of human behavior with respect to authority figures, creating a set of non-seizures that nonetheless relied upon the coercive force of law enforcement).

[6] Wayne R. LaFave, Pinguitudinous Police, Pachydermatous Prey:  Whence Fourth Amendment "Seizures"?, 1991 U. Ill. L. Rev. 729, 739-40.

officer knocked on the car window and instructed the person to roll down the car window. A reasonable person would be concerned that driving away could be viewed as violating some law that governs obstructing an officer, disobeying an officer, or fleeing.

¶74 No reasonable person I can imagine would feel free to simply stay put with the car window closed for substantially the same reasons that no reasonable person would have just driven off.

¶75 As the court of appeals wrote, "when a uniformed officer approaches a vehicle at night and directs the driver to roll down his or her window, a reasonable driver would not feel free to ignore the officer." County of Grant v. Vogt, No. 2012AP1812, unpublished slip op. ¶13 (Wis. Ct. App. March 14, 2013).

¶76 Before I conclude, I address the community caretaker function that the concurrence addresses.

¶77 Exceptions to the warrant requirement are to be carefully delineated. "The State bears the burden of proving that the officer's conduct fell within the scope of a reasonable community caretaker function." State v. Kramer, 2009 WI 14, ¶17, 315 Wis. 2d 414, 759 N.W.2d 598 (citation omitted). The State in the instant case never met or attempted to meet this burden.

¶78 The concurring opinion concludes, "Under the totality of the circumstances, it was objectively reasonable for Officer Small to conclude that the occupants of the vehicle might be in

4

need of assistance." Concurrence, ¶59. But neither the officer's testimony nor the State's arguments demonstrate that the officer ever came to that conclusion or that that conclusion is objectively reasonable on the basis of this record. Overall, the concurring opinion relies on a wholly speculative premise.

¶79 For the reasons set forth, I dissent.

¶80 I am authorized to state that Justice ANN WALSH BRADLEY joins this dissent.