**COURT OF APPEALS
DECISION
DATED AND FILED**

**August 25, 2021**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP355-CR**

STATE OF WISCONSIN

Cir. Ct. No. **2020CT4**

**IN COURT OF APPEALS
DISTRICT II**

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

CALEB JAMES WATSON,

DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Sheboygan County: L. EDWARD STENGEL, Judge. *Affirmed.*

¶1 GUNDRUM, P.J.[1] Caleb James Watson appeals from a judgment of conviction for operating a motor vehicle while intoxicated (OWI), third offense,

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(f) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version.

contending the circuit court erred in denying his motion to suppress evidence. He argues that he was seized in violation of the Fourth Amendment because it was unreasonable for the arresting officer to move him from the site of the initial seizure to the site where field sobriety tests were performed. Because we agree with the circuit court that the officer acted reasonably in moving Watson as he did, we affirm.

## *Background*

¶2 According to the arresting officer's testimony at the suppression hearing, at approximately 3:19 a.m. on January 4, 2020, he was dispatched to investigate an incident of a person "banging and pounding" on a residential door. On his way to and nearby the residence, the officer came upon Watson in the middle of the road. Although the temperature was between twenty-nine and thirty-three degrees, Watson "was wearing a plaid shirt … [l]ike a flannel." Watson told the officer he was coming from a friend's house and had been walking for ten to fifteen minutes. The officer, who smelled a strong odor of intoxicants coming from Watson's breath and observed his speech to be slightly slurred, asked Watson if he had been involved in the "banging and pounding" incident. When Watson responded "no," the officer told Watson that he "would be able to give [Watson] a ride home after [the officer] went and checked out the residence and made sure everything was okay there." The officer did an "external pat down" of Watson for weapons, Watson entered the officer's police vehicle, and the officer drove to the residence related to the reported disturbance.

¶3 At the doorstep to the residence, the officer picked up a cell phone with a charging cable attached, which the homeowner indicated did not belong to him. The homeowner detailed that he had been woken up by someone "banging

and yelling at his door," prompting him to call the police, and that the individual subsequently "walked around to the patio door … and began banging on the door there as well" before it got quiet.

¶4     Other officers arrived at the scene, and one officer indicated that he had observed a Chevy Malibu in a ditch east of the residence.  He checked the license plate number on the Malibu with the Department of Transportation and learned that Watson was the vehicle's registered owner.  He also observed inside the Malibu an open twenty-four-pack of beer with "multiple cans missing."  The arresting officer's testimony additionally suggested that one of the other officers had touched the hood of the Malibu and determined it had been recently operated because it felt warm.  In light of the Malibu-related evidence, the arresting officer indicated to Watson that he did not believe Watson's earlier story of walking for fifteen minutes.

¶5     The arresting officer asked Watson if he would perform field sobriety tests [FSTs], and Watson agreed.  The officer initially advised Watson that he would be taking Watson to the Plymouth Kwik Trip for the FSTs, and Watson agreed.  The officer placed Watson in handcuffs and began transporting him from the immediate area for that purpose.

¶6     While en route to Kwik Trip, officers from the Plymouth Police Department invited the arresting officer to use the Plymouth Police Department for the FSTs, which department was less than a mile and a half away from the Kwik Trip.  According to the arresting officer's testimony, *a Plymouth officer* "said, Hey you can come to our police department and just use our area … just because there wouldn't be anybody walking around.  Nobody watching.  It would strictly just be officers and the defendant."  The arresting officer elaborated that

*the Plymouth police officers* "preferred [the Plymouth Police Department] just due to the fact that it was open, and there weren't going to be outside distractions of people walking around and people watching." The arresting officer testified, however, that *his reasons* for choosing to do the FSTs at the Plymouth Police Department were

> due to the fact that it was … January along with giving [Watson] the best opportunity to perform the test in a controlled environment with no outside distractions, along with preferred lighting, and [being] able to have it video and audio recorded. Also, there was not too big of a shoulder … [on the roadway at the scene] to even perform the test.

The arresting officer testified that he believed he communicated to Watson "that we would be going to the Plymouth Police Department just due to the fact that it [could be] audio and video recorded, along with … giving him a better opportunity to perform the tests." The officer agreed at the hearing that the Plymouth Police Department "would be a more appropriate environment in which to conduct standardized field sobriety tests." Watson agreed to being transported to the Plymouth Police Department for the FSTs.

¶7      The arresting officer also agreed in his testimony that the weather and roadways were clear and there were visible fog lines on the roadway in the immediate area of the initial seizure that he could have used for FSTs with Watson. The officer further agreed that his "in-squad video camera was functioning and working, including with sound" at the time of his interaction with Watson and that he thus "had the capability … to record and capture field sobriety testing for future purposes." Without objection, the circuit court took judicial notice that the Plymouth Police Department was 1.4 miles away from the Plymouth Kwik Trip.

4

¶8    Following testimony, the circuit court considered "the facts and circumstances" and denied the suppression motion, concluding that the arresting officer's decision to transport Watson to the Plymouth Police Department for FSTs was reasonable. The court specifically considered the time of night (after 3:00 a.m.), the cold temperature outside (between twenty-nine and thirty-three degrees) along with the clothing Watson was wearing ("flannel shirt"), the fact that Watson may have been out in the elements for a significant period of time (as he was "originally encountered in the middle of Highway 57, not at his vehicle, and not at the residence in question"), and "the general description of the area of contact between the officer and the defendant, and the area generally surrounding the residence as well as where his vehicle" was. The court added: "knowing that the police agency was open, that it provided a safe, secure, and warm environment, I think that is preferable to using the Kwik Trip, which is open to the general public at that time."

¶9    Watson appeals.

### Discussion

¶10    In reviewing the denial of a motion to suppress, we review de novo the application of undisputed facts to constitutional principles. *See County of Grant v. Vogt*, 2014 WI 76, ¶17, 356 Wis. 2d 343, 850 N.W.2d 253.

¶11    In *State v. Quartana*, 213 Wis. 2d 440, 446, 570 N.W.2d 618 (Ct. App. 1997), we held that "the law permits the police, if they have reasonable grounds for doing so, to move a suspect in the general vicinity of the stop without converting what would otherwise be a temporary seizure into an arrest." Watson does not dispute that, initially, he was lawfully seized for a temporary investigative detention based upon reasonable suspicion that he had been operating

5

his vehicle while intoxicated. Nor does he argue on appeal that his transport by the arresting officer to the Plymouth Police Department was outside of the "vicinity" of that initial seizure.[2] He instead challenges whether the police movement of him from the location of that initial seizure to the Plymouth Police Department for the performance of the FSTs was reasonable. Because we agree with the circuit court that the officer had reasonable grounds for moving him to that location, we affirm.

¶12 Watson relies heavily upon his assertion that the arresting officer transported him to the Plymouth Police Department in order to have him perform the FSTs in a place where "[n]obody [would be] watching. It would strictly just be officers and the defendant." Careful review of the testimony, however, indicates that the idea and suggestion of doing the FSTs at the Plymouth Police Department so that "[n]obody [would be] watching" came from the Plymouth police officers, and at the hearing, the arresting officer was merely testifying to what they had said to him, not that this was his reason for doing the FSTs at the Plymouth Police Department. The reasons the arresting officer gave for transporting Watson to the Plymouth Police Department were due to the fact that it was "January" and the department would give Watson "the best opportunity to perform the test in a controlled environment with no outside distractions, along with preferred lighting, and … be[ing] able to have it video and audio recorded. Also, there was not too big of a shoulder … [on the roadway at the scene] to even perform the test."

---

[2] Watson did raise an outside-of-the-"vicinity" challenge before the circuit court, but since he does not continue that challenge on appeal, we deem him to have abandoned it. *See A.O. Smith Corp. v. Allstate Ins. Cos.*, 222 Wis. 2d 475, 491, 588 N.W.2d 285 (Ct. App. 1998) ("[A]n issue raised in the trial court, but not raised on appeal, is deemed abandoned.").

¶13     We agree with the circuit court that under the circumstances, the Plymouth Police Department was a superior location—for Watson—at which to have the tests performed. The court specifically noted the time of night, the cold temperature outside along with Watson wearing a "flannel shirt" as opposed to a winter coat, that Watson may have been out in the elements for a significant period of time, and "the general description of the area of contact between the officer and the defendant, and the area generally surrounding the residence as well as where his vehicle" was—which we interpret as appropriately considering the arresting officer's testimony that in the area of the residence "there was not too big of a shoulder … to even perform the test." The court added: "knowing that the police agency was open, that it provided a safe, secure, and warm environment, I think that is preferable to using the Kwik Trip, which is open to the general public at that time."

¶14     It is true that in this case, Watson was handcuffed during the transport to the Plymouth Police Department. It is also true that we noted in *Quartana* that transporting a suspect to "a more institutional setting" and less public area—that being the police station here—generally contributes to a reasonable person believing that he or she is under arrest. *See id.* at 450. Under the totality of the circumstances in this case, however, these factors do not make the transport to the police department unreasonable or turn the temporary investigative detention into an arrest.

¶15     The decision to transport Watson to the police department was a congenial one to which Watson had no objections, which is not surprising in light of the cold temperature and how he was dressed at the time. The officer's initial decision to transport Watson to the Kwik Trip for FSTs made sense since there was "not too big of a shoulder" at the scene. Safety of the officer and Watson was

a reasonable basis for this intended transport. Changing locations to instead transport Watson to the police department for FSTs, once that option was offered by the Plymouth police officers, was also reasonable as it was not much farther than the Plymouth Kwik Trip and it was not only a safer location, like the Kwik Trip, than the roadway at the scene, but it was also, as the circuit court noted, a "secure[] and warm environment." In light of how Watson was dressed, this move made sense, and it also avoided "outside distractions," provided "preferred lighting," and still allowed for the FSTs to be "video and audio recorded."

¶16 While Watson focuses on the fact that he was handcuffed and taken to a police department, under these circumstances we do not believe a reasonable person in Watson's position would have believed himself to be under arrest. First, the record provides no reason to believe that Watson was ever told he was under arrest. Second, the arresting officer originally communicated that he would be taking Watson to an open-to-the-public setting—a Kwik Trip—not a closed, institutional setting like a police department. Nobody in Watson's position would think there was a jail cell waiting for him at a Kwik Trip. And when on the way to the Kwik Trip the planned location changed to the police department, the officer explained to Watson why—because it would be audio and video recorded and give Watson "a better opportunity to perform the tests." In light of the totality of the circumstances, a reasonable person in Watson's position would not believe he was under arrest, but would have believed that if he performed adequately on the FSTs, he would be released from custody. Further, the record gives no indication that the arresting officer did not diligently pursue his investigation so as to cause Watson's detention to last longer than necessary to confirm or deny if he was intoxicated. *See* **Quartana**, 213 Wis. 2d at 450 (considering whether the officers

"diligently pursued their investigation" and whether "Quartana's detention lasted … longer than necessary to confirm their suspicions.").

¶17 We conclude that the circuit court correctly determined that the arresting officer acted reasonably in moving Watson to the police department for the FSTs and that the movement did not convert the temporary investigative detention into an arrest.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.